[Crim. No. 20233. Sept. 25, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES MICHAEL WHEELER et al., Defendants and Appellants.

## COUNSEL

Edward I. Gritz, Halpern & Halpern and H. Russell Halpern for Defendants and Appellants.

Paul N. Halvonik, State Public Defender, Clifton R. Jeffers, Chief Assistant State Public Defender, Ezra Hendon, Mark Fogelman, Deputy State Public Defenders, and Jonathan R. Adler as Amici Curiae on behalf of Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen, Harley D. Mayfield, Beatrice W. Kemp and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

C. Stanley Trom, District Attorney (Ventura), Michael D. Bradbury, Assistant District Attorney, and Peter D. Kossoris, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendants James Michael Wheeler and Robert Willis appeal from judgments convicting them of murdering Amaury Cedeno, a grocery store owner, in the course of a robbery. (Pen. Code, §§ 187, 189.)

During the noon hour Cedeno withdrew $6,000 in cash from a bank and returned with the money to his store. As he entered he was seen to be grappling with another man; after a few moments four shots were fired and Cedeno was fatally wounded. The assailant ran from the store with the money, and entered the passenger door of a waiting car that was quickly driven away. A witness noted its license plate number, but did not see the driver.

At trial the principal issue was identification. Two witnesses to the events inside the store identified defendant Willis as the assailant from groups of photographs and from a lineup, and pointed him out in court. Willis sought to discredit this testimony by exploring various discrepancies between his appearance at trial and the descriptions furnished to the police by the witnesses. He also offered an alibi defense.

It was the People's theory that the unseen driver of the getaway car was defendant Wheeler. The sole direct evidence connecting him with that car, however, was two fingerprints found on the driver's door—one on the underside of the armrest and the other on the outside panel. A police expert identified the prints as belonging to Wheeler, but conceded on cross-examination that there is no way of determining when a fingerprint was actually placed on an object. The car in question had been stolen four days before the shooting.

To bolster their case the People also introduced, over objection, evidence of several prior incidents of assertedly similar but uncharged robberies or apparent preparations for robbery in which these defendants and other persons were implicated in varying degrees. Because the convictions must be reversed on other grounds, we do not reach the serious conflict over the admissibility of this evidence.

I

We begin with a claim of error arising at the very outset of the trial and infecting the entire remainder of the proceedings. Defendants are both black; the man they were accused of murdering was white; a number of

blacks were in the venire summoned to hear the case, were called to the jury box, were questioned on voir dire, and were passed for cause; yet the prosecutor proceeded to strike each and every black from the jury by means of his peremptory challenges, and the jury that finally tried and convicted these defendants was all white. The issue is whether in such circumstances defendants were denied their right to trial by an impartial jury guaranteed by the California Constitution. The question is one of first impression in this court.

Not surprisingly, the record is unclear as to the exact number of blacks struck from the jury by the prosecutor: veniremen are not required to announce their race, religion, or ethnic origin when they enter the box, and these matters are not ordinarily explored on voir dire. The reason, of course, is that the courts of California are—or should be—blind to all such distinctions among our citizens.

Nevertheless, when an issue of this nature does arise in any case it is incumbent upon counsel, however delicate the matter, to make a record sufficient to preserve the point for review. In the case at bar defense counsel discharged that burden: after the People had exercised eight peremptory challenges, defense counsel began eliciting from each successive black prospective juror an acknowledgment of his or her race. In a declaration filed in this court, Edward I. Gritz, attorney for defendant Wheeler, explained the reason for undertaking to make that record: "During the course of the voir dire proceedings, and only after two black jurors had been peremptorily excused by the prosecutor, I became aware that the prosecutor was utilizing his peremptory challenges in a systematic effort to exclude any and all otherwise qualified black jurors from serving on my client's petit jury."

Defense counsel thereafter established that prospective jurors Louise Jones, Odessa Bragg, and Napoleon Howard were black.[1] All three responded that racial considerations would not affect their impartiality and they would base their verdict solely on the facts; as Mr. Howard succinctly put it, "We are not trying color. We are trying a case." Both defense counsel passed these prospective jurors for cause, and the prosecutor did likewise after almost perfunctory questioning.[2] Neverthe-

---

[1]For example, counsel for defendant Willis, H. Russell Halpern, made the point as follows in his voir dire examination of Mrs. Jones: "Q. As I admonished the jury earlier, I asked questions that might seem to be personal and prying. My client is black, obviously you are black, too. A. Yes, I am."

[2]He asked four brief questions of Mrs. Bragg, two of Mr. Howard, and none of Mrs. Jones.

less the prosecutor exercised three of his next five peremptory challenges against these same three prospective jurors.

At this point Mr. Gritz expostulated that "It is obvious to me that there will be no blacks on this jury," and moved for a mistrial. He gave his count of the number of black prospective jurors struck by the prosecutor, and stated: "whatever the reason for that is, that's up to him to say. I am not impugning his integrity or anything like that. It is obvious to me that these defendants cannot get a jury of their peers or, how shall I say, a proper cross section of the community, if what is apparent to me is the policy of the district attorney's office. Maybe it is only in this case, I don't know, to excuse all blacks that are being called." His purpose in moving for the mistrial was, he said, "so we can try and get a fair cross section of the community." Mr. Halpern joined in the motion, stressing that from the manner in which the prosecutor was exercising his peremptory challenges "it is apparent that he is using a form of unauthorized procedure, and that is to exclude blacks rather than exclude people who hold prejudices one way or the other."

The trial court asked the prosecutor if he desired to respond, but advised him that "you don't have to respond if you don't wish to." The prosecutor declined to explain his conduct, and the court denied the motion for mistrial.

Voir dire then resumed. Defense counsel established that two more prospective jurors, Lloyd Hill and Evelyn Smith, were black. Both testified that racial considerations would not enter into their deliberations, and Mr. Hill specifically denied that he would be prejudiced in defendants' favor simply because he was black. Voir dire examination of these two prospective jurors by the court and defense counsel was brief and uneventful. Mr. Hill testified he was employed as a car man by the Santa Fe Railroad, his wife was a housewife, and his daughter a waitress; he had never served on a jury before, had never been the victim of or witness to a crime, and had no relatives or friends who were police officers or attorneys. In turn, Mrs. Smith testified she was employed as a cabin service planner by United Airlines and her husband was a presser at a cleaning business; she had previously served on a jury in two civil cases, one of which ended in a nonsuit; she had never been the victim of or witness to a crime, had never testified in court, and had no relatives or friends who were police officers or attorneys. Defense counsel passed both these prospective jurors for cause.

This time the prosecutor asked no questions whatever, quickly passed both Mr. Hill and Mrs. Smith for cause—and then used two of his next three peremptory challenges to strike them from the jury.

Once more Mr. Gritz vigorously objected, stating: "For the record, Your Honor, by my count, there are seven Negroes that have been kicked off the jury by [the prosecutor], I make a motion for mistrial. It is apparent that it is a policy of the district attorney's office not to permit any Negroes on this jury. Some of them have been kicked without him even questioning them. . . . I feel that these defendants cannot get a trial by their peers." Mr. Halpern joined in the motion, contending that because "there is evidence that the peremptory challenge is being used to excuse only blacks from the jury," there is "a prima facie case of abuse" of such challenges by the People.

Again the court offered the prosecutor the opportunity to respond, but made clear that it was "ready to rule on the matter" without the need of any explanations. The prosecutor replied, "I have no response, Your Honor, and I don't wish my silence to be construed as any tacit admission of the charges." The court agreed it was "not considering it as such," and ruled that "Attorneys have a right to select the jury and use all the peremptories available to them without stating the reason."

Impliedly denying the second motion for mistrial, the court directed voir dire to proceed. No more black prospective jurors were called to the box, and in due course 12 regular jurors and 2 alternates were sworn to try the case. They were all white.

■ Article I, section 16, of the California Constitution declares in relevant part that "Trial by jury is an inviolate right and shall be secured to all . . . ." It is settled that in criminal cases the right so declared includes in this state the right to a unanimous verdict. (*People* v. *Feagley* (1975) 14 Cal.3d 338, 350 [121 Cal.Rptr. 509, 535 P.2d 373]; *People* v. *Superior Court* (1967) 67 Cal.2d 929, 932 [64 Cal.Rptr. 327, 434 P.2d 623, 25 A.L.R.3d 1143].) It is equally settled that the provision includes the right to have that verdict rendered by impartial and unprejudiced jurors. Section 16 of article I does not explicitly guarantee trial by an "impartial" jury, as does the Sixth Amendment to the federal Constitution; but that right is no less implicitly guaranteed by our charter, as the courts have long recognized.

The principle derives from "The common-law rule which demanded the strictest impartiality upon the part of each individual juror, [and] which declared that, one and all, should, as between the crown and the defendant, 'stand indifferent as they stand unsworn,' . . ." (*People* v. *Helm* (1907) 152 Cal. 532, 535 [93 P. 99], disapproved on other grounds in *People* v. *Edwards* (1912) 163 Cal. 752, 756 [127 P. 58].)[3] The common law rule was fully embodied in the constitutional jury trial provision: "The right of trial by jury is fundamental. It is a right which was transmitted to us by the common law and as such is expressly guaranteed by the constitution, and the distinctive quality of that right—its very essence—is that every person put upon trial upon an issue involving his life or his liberty is entitled to have such issue tried by a jury consisting of unbiased and unprejudiced persons." (*People* v. *Bennett* (1926) 79 Cal.App. 76, 91 [249 P. 20]; accord, *People* v. *Carmichael* (1926) 198 Cal. 534, 547 [246 P. 62]; *People* v. *Helm* (1907) *supra,* 152 Cal. 532, 536; *People* v. *Reyes* (1855) 5 Cal. 347, 349.)[4]

In a series of decisions beginning almost four decades ago the United States Supreme Court has held that an essential prerequisite to an impartial jury is that it be drawn from "a representative cross-section of the community."[5] The rationale of these decisions, often unstated, is that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the

[3]The *Helm* court was apparently paraphrasing the following language of Lord Coke: "He that is of a jury, must be *liber homo,* that is, not only a freeman and not bond, but also one that hath such freedome of mind as he stands indifferent as he stands unsworne." (1 Coke upon Littleton 155a.)

[4]The Legislature has recognized this right in providing that "It shall be the duty of the trial court to examine the prospective jurors to select *a fair and impartial jury.* He shall permit reasonable examination of prospective jurors by counsel for the people and for the defendant, such examination to be conducted orally and directly by counsel." (Italics added; Pen. Code, § 1078.)

[5]The history and theory of the representative cross-section rule are discussed in Van Dyke, Jury Selection Procedures (1977), chapter 3; Daughtrey, *Cross-Sectionalism in Jury-Selection Procedures After Taylor* v. *Louisiana* (1975) 43 Tenn.L.Rev. 1; and Kuhn, *Jury Discrimination: The Next Phase* (1968) 41 So.Cal.L.Rev. 235.

respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out.[6]

The line of United States Supreme Court cases in point began with *Smith* v. *Texas* (1940) 311 U.S. 128 [85 L.Ed. 84, 61 S.Ct. 164]. There the high court reversed on equal protection grounds a state conviction of a black defendant upon a showing that blacks had been systematically excluded from grand jury service. In language that has proved to be seminal, Justice Black said for a unanimous court: "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." (Fn. omitted; *id.,* at p. 130 [85 L.Ed. at p. 86].) We add that in such a war the courts cannot be pacifists.

In *Glasser* v. *United States* (1942) 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457], the defendants in a federal trial complained of the alleged exclusion from petit jury service of all women not members of the state League of Women Voters. Although rejecting the contention on the ground of insufficient proof, the high court strongly reaffirmed the requirement of a representative jury. It observed at the outset that impartiality achieved through representativeness is essential to preserving the constitutional right to jury trial: "Lest the right of trial by jury be nullified by the improper constitution of juries, the notion of what a proper jury is has become inextricably intertwined with the idea of jury trial." (*Id.,* at p. 85 [86 L.Ed. at p. 707].) Quoting from *Smith* v. *Texas,* the court stated (at p. 86 [86 L.Ed. at p. 707]) that "the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a 'body truly representative of the community,' and not the organ of any special group or class." Finally, the court warned (*ibid.,* [86 L.Ed. at p. 707]) that the officials charged with choosing jurors "must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be

---

[6]As appears from the decisions that follow, the representative cross-section rule also serves other essential functions in our society, such as legitimating the judgments of the courts, promoting citizen participation in government, and preventing further stigmatizing of minority groups.

of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right."

In *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412], the court reversed a tort judgment in a diversity case tried in California on the ground that daily wage earners had been regularly excluded from petit jury service. In language thereafter often repeated, the court said: "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. [Citations.] This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." (*Id.,* at p. 220 [90 L.Ed. at p. 1185].) The court further explained (*ibid* [90 L.Ed. at p. 1185]) that "Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury."

In *Ballard* v. *United States* (1946) 329 U.S. 187 [91 L.Ed. 181, 67 S.Ct. 261], the court reversed a federal conviction on the ground that women had been deliberately excluded from both grand and petit jury service. The court began by reiterating the above-quoted passage from *Thiel* (*id.,* at pp. 192-193 [91 L.Ed. at p. 185]), then addressed the government's contention that an all-male panel drawn from diverse groups would be equally representative because women jurors do not "act as a class." Rejecting this argument, the court reasoned that "the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded. The exclusion of one may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded." (Fn. omitted; *id.,* at pp. 193-194 [91 L.Ed. at p. 186].) And the court concluded (at p. 195 [91 L.Ed. at p. 187]) that "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at

large, and to the democratic ideal reflected in the processes of our courts."

In *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163], the court reversed on equal protection grounds a state conviction of a white defendant upon a showing that blacks had been arbitrarily excluded from grand and petit jury service. The state contended that because the defendant was not himself black he was not harmed by the exclusion. The plurality opinion of Justice Marshall rejected the argument, stating (at p. 503 [33 L.Ed.2d at p. 94]) that "the exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases." The court warned that "the opportunity to appeal to race prejudice is latent in a vast range of issues, cutting across the entire fabric of our society," and concluded, "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." (Fn. omitted; *id.,* at pp. 503-504 [33 L.Ed.2d at p. 94].)

The most recent case of this type was *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]. There the court reversed a state conviction of a male defendant on the ground that women had in effect been totally excluded from jury service. The court reviewed the foregoing precedents and concluded (at p. 528 [42 L.Ed.2d at p. 697]) that "The unmistakable import of this Court's opinions, at least since 1940, *Smith* v. *Texas, supra,* and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." In justifying that conclusion the court stressed (at p. 530 [42 L.Ed.2d at p. 698]) several of the functions served by the representative cross-section requirement: "The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. [Citation.] This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool.

Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." (See also *Ballew* v. *Georgia* (1978) 435 U.S. 223, 235-238 [55 L.Ed.2d 234, 244-245, 98 S.Ct. 1029].)

We have reviewed this line of United States Supreme Court opinions in some detail because we fully agree with the views there expressed as to the importance of the representative cross-section rule, particularly in protecting the constitutional right to an impartial jury.[7] We rely equally, however, on the law of California. It was not until its 1975 decision in *Taylor* that the high federal court imposed the representative cross-section rule on the states as a fundamental component of the Sixth Amendment right to an impartial jury incorporated in the Fourteenth Amendment.[8] In California we had long since adopted that rule.

Thus in *People* v. *White* (1954) 43 Cal.2d 740 [278 P.2d 9], the defendant contended he was denied "his constitutional right to a trial by an impartial jury" because the method used in selecting the jury panel produced a "systematic inclusion of limited classes of persons who did not represent a cross-section of the community," i.e., businessmen and club women, with a resulting exclusion of working class people. (*Id.,* at

---

[7]The rule has also been embodied in federal legislation: in 1968 Congress declared, at the outset of the Jury Selection and Service Act (28 U.S.C. §§ 1861-1869), that "It is the policy of the United States that all litigants in the Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from *a fair cross section of the community* in the district or division wherein the court convenes. . . ." (Italics added; 28 U.S.C. § 1861.)

[8]The path of incorporation was not smooth. As noted above, *Smith* first articulated the rule as a requirement of equal protection. *Glasser, Thiel,* and *Ballard* applied it pursuant to the supervisory power over federal courts. When the high court first declared the Sixth Amendment's guarantee of trial by jury applicable to the states through the Fourteenth Amendment, it was silent on the present question. (*Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444].) Yet when it held two years later that the federal guarantee of a jury trial does *not* require that the jury be composed of 12 persons, the court almost incidentally read the representative cross-section requirement into the *Duncan* rule. (*Williams* v. *Florida* (1970) 399 U.S. 78, 100 [26 L.Ed.2d 446, 460, 90 S.Ct. 1893].) Because *Duncan* did not apply to state trials preceding its rendition (*De Stefano* v. *Woods* (1968) 392 U.S. 631 [20 L.Ed.2d 1308, 88 S.Ct. 2093]), however, the court could not invoke it in *Peters*; instead, the plurality opinion held that conviction by a deliberately unrepresentative jury violated the due process clause of the Fourteenth Amendment, while the concurring opinion rested on federal statutory grounds. Finally, in *Taylor* the court came to grips with the issue and held the representative cross-section rule applicable to the states through the Sixth Amendment right to an impartial jury.

p. 748.) The jury commissioner testified he drew his list largely from the membership rosters of such organizations as the Rotary, Kiwanis, and Lions Clubs, the Chamber of Commerce, and certain women's clubs, and that he attempted to "get as many businessmen on the panel as possible" (*ibid.*).

Although we found the error nonprejudicial in the circumstances of the case because the panel actually selected did in fact include a reasonable representation of working class people, we unanimously condemned the selection system itself for its tendency to produce venires that were not representative cross-sections of the community. We began, as we do here, by quoting well-known passages from *Thiel* and related federal cases. We then turned to the particular issue at hand, i.e., whether the source list used by the jury commissioner was "improperly weighted so as to prevent having a good cross-section of the community for prospective jurors." (*Id.,* at p. 750.) The question was answered in a vigorous affirmative: "Those persons who would be denied the opportunity for jury service under this system would not be excluded because of any lack of ability, intelligence or qualifications but merely because they did not belong to the social and economic strata of the community which compris[e] the membership of certain private clubs and organizations. A system which tends to permit this form of wholesale exclusion of a large segment of our citizens from jury duty would normally prevent the selection of juries from a cross-section of the community. Such a system is highly discriminatory and should not be condoned." (*Id.,* at p. 753.)

Summing up, we repeatedly emphasized (at p. 754) the need for compliance with the representative cross-section rule as a precondition to trial by an impartial jury: "The American system requires an impartial jury drawn from a cross-section of the entire community and recognition must be given to the fact that eligible jurors are to be found in every stratum of society. In selecting a truly representative jury panel, the membership lists of various clubs and organizations may properly be used, but they should not be relied on as the principal source of prospective jurors nor should they be used to the complete exclusion of other general sources more likely to represent a cross-section of the population, such as telephone directories, voting lists, and city directories. Any system or method of jury selection which fails to adhere to these democratic fundamentals, which is not designed to encompass a cross-section of the community or which seeks to favor limited social or economic classes, is not in keeping with the American tradition and will

not be condoned by this court." (See also *People* v. *Carter* (1961) 56 Cal.2d 549, 568-570 [15 Cal.Rptr. 645, 364 P.2d 477].)

The *White* opinion did not specify which Constitution—state or federal—it was relying on as the source of its declared requirement of cross-sectionalism, but simply spoke in broad terms of the "American system" and the "American tradition." California, of course, is an integral part of that system and tradition; and as we noted above, our courts have long recognized that the right to an impartial jury is an inseparable element of the jury trial guarantee of article I, section 16, of the California Constitution. ■ Accordingly, we now make explicit what was implicit in *White*, and hold that in this state the right to trial by a jury drawn from a representative cross-section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution and by article I, section 16, of the California Constitution.[9]

It therefore becomes the responsibility of our courts to insure that this guarantee not be reduced to a hollow form of words, but remain a vital and effective safeguard of the liberties of California citizens. There are three stages in the jury selection process at which the ideal of a representative cross-section can be seriously compromised. The first is the initial compilation of the "roll of eligible juror candidates" (Code Civ. Proc., § 204e) or master list from which, by various steps, the venires are drawn. (*Id.,* §§ 203-220.) Obviously if that list is not representative of a cross-section of the community, the process is constitutionally defective *ab initio.* The issue has been extensively litigated[10] and has received the

[9]In an earlier decision this court reversed a conviction of a black defendant upon a showing that blacks had been systematically excluded from venires and petit juries in Merced County, a practice we condemned as a denial of an impartial jury, of due process, and of equal protection. Quoting both the Sixth and Fourteenth Amendments, we said: " 'Clearly the preceding mandates imply that one who is on trial for an alleged crime is entitled to a jury from which individuals of his own race who are otherwise qualified as jurors in the particular case, have not been arbitrarily excluded merely because of their nationality, race or color.' " (*People* v. *Hines* (1939) 12 Cal.2d 535, 539 [86 P.2d 92].)

In two more recent decisions—still prior to *Taylor*—we again recognized the Sixth Amendment basis of the right to a representative cross-section of the community, but did not consider whether it might also be founded on article I, section 16, of the California Constitution. (*Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 59-60 [115 Cal.Rptr. 247, 524 P.2d 375]; *People* v. *Jones* (1973) 9 Cal.3d 546, 556 [108 Cal.Rptr. 510 P.2d 705].)

[10]Numerous federal cases have addressed the question, including the Supreme Court decisions cited hereinabove. (See generally Gewin, An Analysis of Jury Selection Decisions, appen. to *Foster* v. *Sparks* (5th Cir. 1975) 506 F.2d 805, 811.) For additional California cases, see, e.g., *People* v. *Spears* (1975) 48 Cal.App.3d 397 [122 Cal.Rptr. 93]

close attention of legal commentators.[11] In the case at bar, however, no claim is made that the master list, or indeed the venire drawn therefrom, was unrepresentative.

Secondly, a number of prospective jurors thus selected are disqualified or excused by judges or various court personnel on grounds of competency (Code Civ. Proc., §§ 198, 199), suitability (*id.*, §§ 204d, 205, subd. (a)), undue hardship (*id.*, § 200), or, until recently, occupation (*id.*, former § 200, repealed by Stats. 1975, ch. 593, § 2, p. 1310). The almost total elimination in 1975 of automatic exemptions for occupational reasons was a commendable step towards preserving the representative character of the jury.[12] But the continuing power to excuse prospective jurors on the grounds of "suitability" and "undue" hardship is highly discretionary in nature, and courts must be alert to prevent its abuse. In particular, excessive excuses on such grounds as sex, age, job obligations, or inadequate jury fees, can upset the demographic balance of the venire in essential respects.[13] Again, defendants herein do not complain of such abuse.

Thirdly, when the case is called for trial the clerk draws the names of veniremen at random from the "trial jury box" (Code Civ. Proc., § 600), and the parties may exercise their statutory challenges to the jurors thus chosen. (Pen. Code, §§ 1055-1089.) Challenges to an individual juror are of two kinds, peremptory and for cause. (*Id.,* § 1067.) A peremptory challenge is "an objection to a juror for which no reason need' be given, but upon which the Court must exclude him." (*Id.,* § 1069.) A challenge for cause is either "general"—the juror is legally incompetent to serve in any case—or "particular"—the juror is actually or impliedly biased in the specific matter on trial. (*Id.,* §§ 1071-1073.) Actual bias is "the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire

---

(petit jury venire); *People* v. *Powell* (1974) 40 Cal.App.3d 107, 124-133 [115 Cal.Rptr. 109] (same); *Adams* v. *Superior Court* (1972) 27 Cal.App.3d 719 [104 Cal.Rptr. 144] (same); *People* v. *Pinell* (1974) 43 Cal.App.3d 627 [117 Cal.Rptr. 913] (grand jury venire); *People* v. *Goodspeed* (1972) 22 Cal.App.3d 690, 699-703 [99 Cal.Rptr. 696] (same); *In re Wells* (1971) 20 Cal.App.3d 640, 649-650 [98 Cal.Rptr. 17] (same); *People* v. *Newton* (1970) 8 Cal.App.3d 359, 388-391 [87 Cal.Rptr. 394] (both).

[11]See, e.g., Van Dyke, *op. cit. supra,* footnote 5, at chapter 4; Kairys et al., *Jury Representativeness: A Mandate for Multiple Source Lists* (1977) 65 Cal.L.Rev. 776; Note, *The Congress, the Court and Jury Selection: A Critique of Titles I and II of the Civil Rights Bill of 1966* (1966) 52 Va.L.Rev. 1069.

[12]In 1977 the Legislature restored the former exemption of peace officers. (Stats. 1977, ch. 748, § 1, p. —.)

[13]The dangers are discussed in Van Dyke, *op. cit. supra,* footnote 5, at chapter 5.

impartiality and without prejudice to the substantial rights of either party" (*id.*, § 1073). Implied bias arises when the juror stands in one of several relationships to a party, such as consanguinity, trust, or employment, or has been involved in prior legal proceedings relating to the parties or the case (*id.*, § 1074); in such circumstances no proof of prejudice is required—it is inferred as a matter of law.

The purpose of the challenge stage of jury selection is apparent from these statutory provisions and the constitutional considerations discussed above. Until this point in the process the goal of an impartial jury is pursued by insuring that the master list be a representative cross-section of the community and that the venire and the proposed trial jury be drawn therefrom by wholly random means. But precisely because it is both all-inclusive and random, the process cannot consistently screen out those prospective jurors who bring to the courtroom a bias concerning the particular case on trial or the parties or witnesses thereto—we may call this "specific bias"—derived, for example, from personal experience or from general exposure to pretrial publicity. Yet such persons must evidently be excused from the jury insofar as possible if the goal of impartiality is to be achieved. The law therefore presumes that each party will use his challenges to remove those prospective jurors who appear most likely to be biased against him or in favor of his opponent; by so doing, it is hoped, the extremes of potential prejudice on both sides will be eliminated, leaving a jury as impartial as can be obtained from the available venire.

The purpose of the challenges also dictates their scope: they are to be used to remove jurors who are believed to entertain a specific bias, and no others. In the case of challenges for cause the matter is clear: the above-quoted statutory definition of actual bias is a literal description of this state of mind, i.e., a prejudice "in reference to the case, or to either of the parties" (Pen. Code, § 1073).

The issue is somewhat more complex with respect to peremptory challenges, but the answer remains the same. It is true that the statute defines such a challenge as one for which "no reason need be given" (*id.*, § 1069); but it does not follow therefrom that it is an objection for which no reason need *exist.* On the contrary, in view of the limited number of such challenges allowed by statute[14] we may confidently disregard the possibility that a party will squander his peremptories by removing jurors, simply because he has the right to do so, for frivolous reasons. In

---

[14]If the offense charged is punishable by imprisonment for 90 days or less, each side has six peremptory challenges. (Pen. Code, § 1070, subd. (b).) In the case of all other offenses not punishable by death or life imprisonment—including therefore the vast

practice, a party will use a peremptory challenge only when he believes that the juror he removes may be consciously or unconsciously biased against him, or that his successor may be less biased.[15]

To say that peremptories will ordinarily be exercised only in cases of bias, however, does not clarify the kinds of bias upon which the challenge may permissibly be based. In contrast to the limited list of events authorizing a challenge for cause on the ground of implied bias (Pen.. Code, § 1074), the law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative.

For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle. In turn, a defendant may suspect prejudice on the part of one juror because he has been the victim of crime or has relatives in law enforcement, and on the part of another merely because his answers on voir dire evince an excessive respect for authority. Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another" (4 Blackstone, Commentaries *353)—upon entering the box the juror may have smiled at the defendant, for instance, or glared at him. Responsive to this reality, the law allows removal of a biased juror by a challenge for which no reason "need be given," i.e., publicly stated: in many instances the party either cannot establish his reason by normal methods of proof or cannot do so without causing embarrassment to the challenged venireman and resentment among the remaining jurors.[16]

---

majority of felonies and all serious misdemeanors—each side has 10 peremptory challenges. (*Id.,* subd. (a), as amended by Stats. 1978, ch. 98, § 2, p. —.) In the case of the few offenses punishable by death or life imprisonment, each side has 26 peremptory challenges. (*Ibid.*) (See also *id.,* § 1070.5 (multiple defendants).)

[15]The hyperbole of certain earlier opinions—e.g., that peremptory challenges may be invoked "upon the mere whim or caprice" of the parties (*People* v. *Helm* (1907) *supra,* 152 Cal. 532, 535)—should be reconsidered in the light of these pragmatic imperatives.

[16]The *latter point touches on an additional purpose served by the peremptory* challenge: it allows a party to remove a juror whom he has offended by a probing voir dire or by an unsuccessful challenge for cause, and thereby safeguards the vigorous exercise of both those rights. (See, e.g., *People* v. *Durrant* (1897) 116 Cal. 179, 198-199 [48 P. 75].) Blackstone agrees, and adds another function of the peremptory: to preserve the appearance as well as the substance of impartiality by guaranteeing the defendant he will not be tried by anyone whom he intuitively dislikes. (4 Blackstone, Commentaries *353;

All of these reasons, nevertheless, share a common element: they seek to eliminate a specific bias as we have defined that term herein—a bias relating to the particular case on trial or the parties or witnesses thereto. By the same token, they are essentially neutral with respect to the various groups represented on the venire: the characteristics on which they focus cut across many segments of our society. Thus both blacks and whites may have prior arrests, both rich and poor may have been crime victims, both young and old may have relatives on the police force, both men and women may believe strongly in law and order, and members of any group whatever may alienate a party by "bare looks and gestures." It follows that peremptory challenges predicated on such reasons do not significantly skew the population mix of the venire in one direction or another; rather, they promote the impartiality of the jury without destroying its representativeness.

By contrast, when a party presumes that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds—we may call this "group bias"—and peremptorily strikes all such persons for that reason alone, he not only upsets the demographic balance of the venire but frustrates the primary purpose of the representative cross-section requirement. That purpose, as we have seen, is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority. Seen in this light, the presumed group bias that triggered the peremptory challenges against its members is indistinguishable from the group perspective we seek to encourage by the cross-section rule.[17]

We conclude that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to

see generally Babcock, *Voir Dire: Preserving "Its Wonderful Power"* (1975) 27 Stan.L.Rev. 545, 552-555.)

[17]As a recent commentator aptly put the point in the context of the case at bar, "It may be argued that the exclusion of jurors on the basis of group membership would be acceptable where it is believed that, for example, blacks are consistently more biased in favor of acquittal than whites. The argument misses the point of the right to an impartial jury under *Taylor*. Blacks may, in fact, be more inclined to acquit than whites. The tendency might stem from many factors, including sympathy for the economic or social circumstances of the defendant, a feeling that criminal sanctions are frequently too

trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. This does not mean that the members of such a group are immune from peremptory challenges: individual members thereof may still be struck on grounds of specific bias, as defined herein.[18] Nor does it mean that a party will be entitled to a petit jury that proportionately represents every group in the community: we adhere to the long-settled rule that no litigant has the right to a jury · that mirrors the demographic composition of the population, or necessarily includes members of his own group, or indeed is composed of any particular individuals. (See, e.g., *People* v. *White* (1954) *supra,* 43 Cal.2d 740, 749; *People* v. *Hines* (1939) *supra,* 12 Cal.2d 535, 539; *People* v. *Durrant* (1897) *supra,* 116 Cal. 179, 199; *People* v. *Breckenridge* (1975) 52 Cal.App.3d 913, 920 [125 Cal.Rptr. 425]; *People* v. *Spears* (1975) *supra,* 48 Cal.App.3d 397, 401-402; *People* v. *Superior Court (Dean)* (1974) 38 Cal.App.3d 966, 973 [113 Cal.Rptr. 732]; *People* v. *Gonzales* (1972) 28 Cal.App.3d 1091, 1097 [104 Cal.Rptr. 530].)

What it does mean, however, is that a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits. Obviously he cannot avoid the effect of that process: the master list must be reduced to a manageable venire, and that venire must in turn be reduced to a 12-person jury. The best the law can do to accomplish those steps with the least risk to the representative nature of the jury pool is to take them by random means, i.e., by drawing lots. We recognize that in a predictable percentage of cases the result will be a wholly unbalanced jury, usually composed exclusively of members of the majority group. This is inevitable, the price we must pay for juries of a workable size. It is no less inevitable, however, that in all other instances—as in the case at bar—the representative nature of the pool or venire will be reflected at least in

harshly applied, or simply an understandable suspicion of the operations of government. Whites may also be more inclined to convict, particularly of crimes against a white victim. But these tendencies do not stem from individual biases related to the peculiar facts or the particular party at trial, but from differing attitudes toward the administration of justice and the nature of criminal offenses. The representation on juries of these differences in juror attitudes is precisely what the representative cross-section standard elaborated in *Taylor* is designed to foster." (Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries* (1977) 86 Yale L.J. 1715, 1733, fn. 77.)

[18]For example, in the case at bar the black prospective juror Napoleon Howard disclosed on voir dire that he had a stepson who had been convicted of crime and was currently incarcerated. A personal experience of this nature, suffered either by the juror or a close relative, has often been deemed to give rise to a significant potential for bias against the prosecution.

some degree in the 12 persons called at random to the jury box. It is that degree of representativeness—whatever it may prove to be—that we can and must preserve as essential to trial by an impartial jury. Certainly the prospective jurors are then subject to challenges for cause and peremptory challenges on grounds of specific bias; but for the reasons stated above we cannot countenance the decimation of the surviving jurors by peremptory challenges on the ground of group bias alone.

## II

The question of remedy remains, and we do not underestimate its difficulty.[19] ■ We begin with the proposition that in any given instance the presumption must be that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground. We adopt this presumption for several reasons: in deference to the legislative intent underlying such challenges, in order to encourage their use in all proper cases, and out of respect for counsel as officers of the court.

Yet it is only a presumption, and must be rebuttable if the foregoing constitutional right is not to be nullified even by honest zeal. The issue is what showing is necessary to rebut it. We must define a burden of proof which a party may reasonably be expected to sustain in meritorious cases, but which he cannot abuse to the detriment of the peremptory challenge system.

In their briefs on appeal defendants propose a mathematical method of analyzing numerical data derived from voir dire to determine the statistical probability, expressed as a percentage, that the prosecutor exercised his peremptory challenges against black prospective jurors on a purely random basis. They calculate that chance as 2.8 percent, conclude there was a 97.2 percent probability that the elimination of all black

[19]In recent years a variety of solutions have been proposed in the literature that do not seem entirely satisfactory. (See, e.g., Note, *Racial Discrimination in Jury Selection* (1977) 41 Albany L.Rev. 623; Comment, *The Prosecutor's Exercise of the Peremptory Challenge to Exclude Nonwhite Jurors: A Valued Common Law Privilege in Conflict With the Equal Protection Clause* (1977) 46 U.Cin.L.Rev. 554; Comment, *A Case Study of the Peremptory Challenge: A Subtle Strike at Equal Protection and Due Process* (1974) 18 St. Louis U.L.J. 662; Note, *Peremptory Challenge—Systematic Exclusion of Prospective Jurors on the Basis of Race* (1967) 39 Miss. L.J. 157; Comment, *Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All-White Jury* (1966) 52 Va.L.Rev. 1157, 1173-1175; cf. LaRue, *A Jury of One's Peers* (1976) 33 Wash. & Lee L.Rev. 841; Note, *The Case for Black Juries* (1970) 79 Yale L.J. 531.)

jurors was intentional, and infer that intent was racially motivated.[20] An amicus curiae for defendants begins with the same data, but uses a different mathematical method of analyzing it and produces a slightly different figure.[21]

We decline to accept either proposal, not because of the discrepancy between their results but because of their inappropriateness to the need at hand. The method suggested by amicus, commonly called statistical decision theory, has impressive credentials: the United States Supreme Court has given it increasing weight in the past decade,[22] and it has been enthusiastically espoused by scholars.[23] But its use thus far has been limited to reviewing an earlier stage in the jury selection process, i.e., whether the master list or the grand or petit jury venire constitutes a representative cross-section of the community. Even for that purpose the technique has been criticized on the ground that it "involves complicated calculations resulting in answers that are difficult to visualize and evaluate," and that "the result is significantly affected by the choice of sample size." (Fn. omitted.) (Kairys et al., *op. cit. supra,* fn. 11, at p. 794.) More disturbing for our purpose is the declaration by a leading writer in the field that because of the discretionary nature of peremptory challenges it is "virtually impossible" for statistical decision theory to demonstrate racial motivation in the striking of blacks from a petit jury.[24]

---

[20]Defendants assume, as their counsel asserted at trial, that the total number of blacks excused by peremptory challenge was seven. The prosecutor never conceded that figure was correct, but in the view we take of the matter the conflict is immaterial.

[21]By amicus' calculation there was a 98.3 percent probability that the total exclusion of blacks herein was intentional. In their petitions for hearing in this court defendants apparently adopt this figure and the method used to reach it.

[22]Compare *Whitus* v. *Georgia* (1967) 385 U.S. 545, 552, footnote 2 [17 L.Ed.2d 599, 605, 87 S.Ct. 643], with *Alexander* v. *Louisiana* (1972) 405 U.S. 625, 630, footnote 9 [31 L.Ed.2d 536, 541, 92 S.Ct. 1221], and *Castaneda* v. *Partida* (1977) 430 U.S. 482, 496-497, footnote 17 [51 L.Ed.2d 498, 511-512, 97 S.Ct. 1272]; see also *id.,* at page 489, footnote 8 [51 L.Ed.2d 506].

[23]Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases* (1966) 80 Harv.L.Rev. 338; Kairys, *Juror Selection: The Law, a Mathematical Method of Analysis, and a Case Study* (1972) 10 Am.Crim.L.Rev. 771, 785-789; Sperlich & Jaspovice, *Statistical Decision Theory and the Selection of Grand Jurors: Testing for Discrimination in a Single Panel* (1975) 2 Hastings Const.L.Q. 75; Comment, *The Civil Petitioner's Right to Representative Grand Juries and a Statistical Method of Showing Discrimination in Jury Selection Cases Generally* (1973) 20 UCLA L.Rev. 581, 620-631.

[24]Finkelstein, *op. cit. supra,* footnote 23, at page 352 ("there remains a broad area of discretion in the use of such strikes or challenges which makes it virtually impossible to determine from population statistics, however carefully refined, the probability that a Negro will appear on a petit jury").

We need not undertake in this proceeding to mediate any such dispute among experts, nor to decide which computational method is preferable for resolving attacks on the master list or the venire. Such cases are clearly distinguishable, as the final demographic composition of those lists is known when the issue arises: at that time, when all the figures are in, mathematical techniques may well be of assistance to the courts. (See, e.g., cases cited in fn. 10, *ante.*) But they are of little help during voir dire, when the composition of the jury is constantly changing under the influence of challenges—and when counsel may be trying to expose an emerging pattern of discrimination in time to forestall an unfair trial.

In that setting, rather, we rely on more traditional procedures.[25] █ If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, as in the case at bar, he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.[26] Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias.

We shall not attempt a compendium of all the ways in which a party may seek to make such a showing. For illustration, however, we mention certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole.[27] Next, the showing may be

[25]The solution that follows is supported, with variations, by a substantial body of scholarly opinion. (See, e.g., Van Dyke, *op. cit. supra,* fn. 5, at pp. 166-167; Kuhn, *op. cit. supra,* fn. 5, at pp. 293-295; Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries* (1977) 86 Yale L.J. 1715, 1738-1741; Note, *The Jury: A Reflection of the Prejudices of the Community* (1969) 20 Hastings L.J. 1417, 1430-1433.)

[26]Because there can be no doubt that the blacks in the present case constitute a cognizable group for such purpose, we have no occasion to explore the point further at this time. For a useful discussion of the subject, see Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries* (1977) 86 Yale L.J. 1715, 1735-1738.

[27]For example, in a case of alleged exclusion on the ground of race it may be significant if the persons challenged, although all black, include both men and women and are of a variety of ages, occupations, and social or economic conditions.

supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, under *Peters* and *Taylor* the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.

Upon presentation of this and similar evidence—in the absence, of course, of the jury—the court must determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone. We recognize that such a ruling "requires trial judges to make difficult and often close judgments. They are in a good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors." (Kuhn, *op. cit. supra*, fn. 5, at p. 295.) They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay.

If the court finds that a prima facie. case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone.[28] The showing need

---

[28]At this point the statutory provision that "no reason need be given" for a peremptory challenge (Pen. Code, § 1069) must give way to the constitutional imperative: the statute is not invalid on its face, but in these limited circumstances it would be invalid as applied if it were to insulate from inquiry a presumptive denial of the right to an impartial jury.

That right is paramount because the peremptory challenge is not a constitutional necessity but a statutory privilege. The point was made with characteristic clarity by Justice (then Presiding Justice) Sullivan, writing for the court in *People* v. *King* (1966) 240 Cal.App.2d 389 [49 Cal.Rptr. 562, 21 A.L.R.3d 706]. After reviewing numerous statements in federal and state decisions on the origins and importance of the peremptory challenge, Justice Sullivan concluded: "Notwithstanding such distinguished ancestry and respected career, neither the United States Constitution nor the Constitution of California in their respective provisions securing to the accused his right to trial by jury (U.S. Const., 6th Amend.; Cal. Const., art. I, § 7 [now § 16]), or elsewhere, requires that Congress or the California Legislature grant peremptory challenges to the accused [or prosecutor] or prescribes any particular method of securing to an accused [or prosecutor] the right to exercise the peremptory challenges granted by the appropriate legislative body. [Citations.] The matter of peremptory challenges rests with the Legislature, limited only by the necessity of having an impartial jury." (*Id.,* at pp. 399-400.)

not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein. He, too, may support his showing by reference to the totality of the circumstances: for example, it will be relevant if he can demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds. And again we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.

If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted. Accordingly, the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected. So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges. Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew.[29]

[29]Additional sanctions are proposed in the literature (fn. 25, *ante*), but we have no present grounds to believe that the above procedure will be ineffective to deter such abuses of the peremptory challenge. If experience should prove otherwise, it will be time enough then to consider alternative penalties.

Although in the present appeal the Attorney General for obvious reasons does not claim the right to object to the same misuse of peremptory challenges on the part of defense counsel, we observe for the guidance of the bench and bar that he has that right under the constitutional theory we adopt herein: the People no less than individual defendants are entitled to a trial by an impartial jury drawn from a representative cross-section of the community. Furthermore, to hold to the contrary would frustrate other essential functions served by the requirement of cross-sectionalism. (See fn. 6, *ante.*) For example, when a white defendant is charged with a crime against a black victim, the black community as a whole has a legitimate interest in participating in the trial proceedings; that interest will be defeated if the prosecutor does not have the power to thwart any defense attempt to strike all blacks from the jury on the ground of group bias alone.

We do not reach, however, the question of the applicability of this decision to civil cases. Although article I, section 16, of the California Constitution governs such cases as well, most of the state and federal authorities relied on herein invoke the requirement of cross-sectionalism in the context of a criminal trial only. Whether the requirement also applies in a civil setting turns on such considerations as the function of a jury in that setting. Because the issue is not presented in the case at bar, we leave it to another day.

 Applying these rules to the record before us, we hold that defendants made a prima facie showing that the prosecutor was exercising peremptory challenges against black jurors on the ground of group bias alone. The trial court therefore erred in ruling that the prosecutor was not required to respond to the allegation, and in denying defendants' motions without a rebuttal showing by the prosecutor that the challenges were each predicated on grounds of specific bias.[30]

The error is prejudicial per se: "The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside." (*People* v. *Riggins* (1910) 159 Cal. 113, 120 [112 P. 862]; accord, *People* v. *Carmichael* (1926) *supra,* 198 Cal. 534, 547; *People* v. *Diaz* (1951) 105 Cal.App.2d 690, 696-700 [234 P.2d 300]; *People* v. *O'Connor* (1927) 81 Cal.App. 506, 519-521 [254 P.2d 630]; *People* v. *Wismer* (1922) 58 Cal.App. 679, 687 [209 P. 259]; cf. *Ballard* v. *United States* (1946) *supra,* 329 U.S. 187, 195 [91 L.Ed. 181, 186-187] (federal rule).) The judgments must therefore be reversed and the cause remanded for a new trial.[31]

### III

The People nevertheless contend that we are compelled to allow this pernicious practice to continue in our courts by the case of *Swain* v. *Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824]. There a black defendant was convicted of rape and sentenced to death by an all-white jury after the prosecutor had struck each of the six blacks on the venire by the equivalent of peremptory challenges. In an opinion concurred in by only five justices (*id.,* at pp. 209-222 [13 L.Ed.2d at pp. 766-774]) the court rejected the defendant's claim of a violation of the equal protection

---

[30]Because the prosecutor declined to give any such reason, we shall not speculate on whether he could have done so. (Cf. fn. 18, *ante.*) Instead of justifying his own conduct, the prosecutor simply retorted that defense counsel seemed in their turn to be striking from the jury "all elderly business people" and most of those with Spanish surnames. A party does not sustain his burden of justification by attempting to cast a different burden on his opponent.

[31]The rule we adopt herein applies to the defendants in the case at bar and in the companion matter of *People* v. *Johnson* (1978) *post,* page 296 [148 Cal.Rptr. 915, 583 P.2d 774], and to any defendant now or hereafter under sentence of death. (Cf. *In re Jackson* (1964) 61 Cal.2d 500 [39 Cal.Rptr. 220, 393 P.2d 420].) In all other cases the rule will be limited to voir dire proceedings conducted after the present decision becomes final. (See *People* v. *Cook* (1978) *ante,* pp. 67, 99, fn. 18 [148 Cal.Rptr. 605, 583 P.2d 130], and cases cited.)

clause of the Fourteenth Amendment. Reviewing the grounds of peremptory challenges, the court noted—with no expression of disapproval—that such a challenge is "frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation, or affiliations of people summoned for jury duty." (Fn. omitted; *id.,* at p. 220 [13 L.Ed.2d at pp. 772-773].) The court reaffirmed the point by observing (at p. 221 [13 L.Ed.2d at p. 773]) that "veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges," but rather may be excluded on the ground of their "group affiliations." The court then held that the presumption of validity of the prosecutor's use of peremptories in any given trial "is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes." (*Id.,* at p. 222 [13 L.Ed.2d at p. 773].)

The high court reached this conclusion because of its concern (*ibid.*) that under a contrary rule the challenge "would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity."[32] Finally, in a dictum concurred in by only four justices (cf. opn. of Harlan, J., 380 U.S. 228 [13 L.Ed.2d 777]), the opinion implied that a meritorious equal protection claim might be stated "when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be," removed every black from every petit jury. (*Id.,* at p. 223 [13 L.Ed.2d at p. 774].)

It is true that *Swain* adjudicated the issue in terms of the equal protection clause of the Fourteenth Amendment rather than the impartial jury guarantee of the Sixth Amendment, presumably because the case predated both *Duncan* and *Taylor.* (See fn. 8, *ante.*) But we shall not attempt to distinguish it on that ground. The court's motivation in *Swain* seems to have been its desire to avoid what it believed would be "a radical change in the nature and operation of the [peremptory] chal-

[32]We emphasize that under the rule we adopt herein (part II, *ante*) peremptories are not "open to examination" unless and until on a timely motion the trial court is satisfied there is a prima facie showing that jurors are being challenged on the sole ground of group bias; that even then the prosecutor is not required to defend "each and every challenge" but only those he has exercised against members of the identified group; and that the issue in such event is not his "judgment" or "sincerity" but simply whether his ground of challenge was a specific bias on the part of the individual juror.

lenge" (380 U.S. at pp. 221-222 [13 L.Ed.2d at p. 773]), and we strongly suspect that desire has survived the advent of the *Taylor* rule.[33] We therefore assume that if the present question were before the high court it would reaffirm *Swain* and reach the same result under the representative cross-section rule as it did under the equal protection clause.

 Because a fundamental safeguard of the California Declaration of Rights is at issue, however, "our first referent is California Law" and divergent decisions of the United States Supreme Court "are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law." (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108]; accord, *People* v. *Hannon* (1977) 19 Cal.3d 588, 606 [138 Cal.Rptr. 885, 564 P.2d 1203]; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [141 Cal.Rptr. 315, 569 P.2d 1303]; *People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753].) It is apparent that *Swain* provides less protection to California residents than the rule we now adopt. Under *Swain* a defendant is barred from vindicating his right to an impartial jury unless he can prove that over a long period of time the same prosecutor has struck every black from every petit jury "whatever the circumstances, whatever the crime and whoever the defendant or the victim may be."

To begin with, *Swain* obviously furnishes no protection whatever to the first defendant who suffers such discrimination in any given court—or indeed to all his successors, until "enough" such instances have accumulated to show a pattern of prosecutorial abuse. Yet in California each and every defendant—not merely the last in this artificial sequence—is constitutionally entitled to trial by a jury drawn from a representative cross-section of the community.

Moreover, even if we consider only the defendant who believes himself in a position to invoke the exception suggested in *Swain,* we see that his attempt to comply with the federal standard of proof is bound to fail. The defendant is party to only one criminal proceeding, and has no personal experience of racial discrimination in the other trials held in that court. Nor can he easily obtain such information, for several reasons: First, those defendants who are indigent or of limited means cannot afford to pay investigators to develop the necessary data. Second, even if the funds were available—or the public defender's office were willing and able to

---

[33]We note that the author of the majority opinion in *Swain,* Justice White, also authored the majority opinion in *Taylor.*

do the research—the time is not: by definition, abuse of peremptory challenges does not appear until the jury selection process is well under way—as in the case at bar—and few if any trial judges would be willing to interrupt the proceedings at that point by a continuance of unpredictable length to permit the necessary investigation. Third, even if the funds and time were available, the data is not: we know of no central register conveniently listing the names and races of all jurors peremptorily challenged by the prosecution in a given court.[34]

Rather, the defendant would be required to somehow obtain and analyze the records of an undetermined number of individual trials in the hope of finding a pattern of abuse among the many peremptory challenges there exercised by the People. But he would have no practical way of discovering which of the excused jurors were black, or of proving their race even if he could learn of it; nor, for the same reasons, could he discover and prove the race of each of the previous defendants and their victims. And even if he could somehow show such a pattern at the hands of certain prosecutors, what of other prosecutors who had more recently joined the local district attorney's office? Would they be immunized from any inquiry until they had made a "record" of such discrimination? If so, how many "free" unrepresentative juries would each be entitled to?

That these are not fanciful concerns is dramatically demonstrated by the history of attempts by black defendants to meet the *Swain* burden of proof. Those attempts, in both federal and state courts, were recently reviewed in some detail (Annot., Use of Peremptory Challenge to Exclude from Jury Persons Belonging to a Class or Race (1975) 79 A.L.R.3d 14, 56-73), and the author concluded (at p. 24) that in the 10 years since *Swain* "in all of the cases involving this issue thus far, all of which have dealt with blacks as the group peremptorily challenged, *no defendant has yet been successful* in proving to the court's satisfaction an invidious discrimination by the use of the peremptory challenge against blacks over a period of time." (Italics added; fn. omitted.) The California experience has been identical: numerous decisions of the Court of Appeal have adopted the *Swain* burden of proof; numerous black defendants have attempted to comply with it, but none has succeeded.[35]

---

[34]In a related context it was noted, "In California one of the problems faced by blacks who seek to prove a prima facie case of discrimination from the composition of the venire that results from whatever selection process is employed appears to be that our officials are very properly colorblind and do not keep records based on race." (*People v. Jones* (1972) 25 Cal.App.3d 776, 782, fn. 5 [102 Cal.Rptr. 277].)

[35]See, e.g., *People v. Wiley* (1976) 57 Cal.App.3d 149, 166 [129 Cal.Rptr. 13]; *People v. Allums* (1975) 47 Cal.App.3d 654, 663-664 [121 Cal.Rptr. 62]; *People v. Anderson* (1975)

It demeans the Constitution to declare a fundamental personal right under that charter and at the same time make it virtually impossible for an aggrieved citizen to exercise that right. ▮ For the reasons stated, the rule of *Swain* v. *Alabama* is not to be followed in our courts and the cases applying it are disapproved to that extent. (See fn. 35, *ante.*)[36] ▮ Rather, all claims in California courts that peremptory challenges are being used to strike jurors solely on the ground of group bias are to be governed by article I, section 16, of the California Constitution and the procedure outlined above.

In view of our disposition herein it is unnecessary to reach defendants' additional contentions.

The judgments are reversed.

Tobriner, J., Manuel, J., and Newman, J., concurred.

**BIRD, C. J.,** Concurring.—I agree with the result reached by the majority that the state's use of peremptory challenges to remove prospective jurors on the sole ground of race violates the right to trial by jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. I do not believe that the state can systematically exclude blacks from serving on a jury by the selective use of the peremptory challenge by the state's representative, i.e., the prosecutor. However, I do not concur in the dicta in the majority opinion which suggest other restrictions on the use of peremptory challenges. The peremptory challenge is not a challenge for cause. The distinction between the two should not be blurred in our attempt to stop an unconstitutional practice.

---

44 Cal.App.3d 723, 726-727 [118 Cal.Rptr. 918]; *In re Wells* (1971) *supra*, 20 Cal.App.3d 640, 647-648; see also *People* v. *Gardner* (1975) 52 Cal.App.3d 559, 562 [125 Cal.Rptr. 186]; *People* v. *Wheeler* (1971) 23 Cal.App.3d 290, 309-310 [100 Cal.Rptr. 198].

[36]The Attorney General also invokes language in *People* v. *Floyd* (1970) 1 Cal.3d 694, 727-728 [83 Cal.Rptr. 608, 464 P.2d 64], a capital case in which a majority of this court quoted from *Swain* in rejecting a complaint that the prosecutor peremptorily challenged certain jurors solely because of their scruples against the death penalty. The reference to *Swain* was essentially dictum, however, because the opinion concluded (at p. 728) that "In any event, the *voir dire* examination of the jurors fails to establish" that any juror had in fact been challenged on that ground. Any implication of *Floyd* contrary to our decision in the case at bar is disapproved.

**RICHARDSON, J.**—I respectfully dissent.

In my opinion when a lawyer during the course of a civil or criminal trial exercises a peremptory challenge he is not accountable for his decision to anyone. This has been axiomatic for many years both in the United States generally and in California. As to criminal cases the rule is cemented in Penal Code section 1069 which provides: "A peremptory challenge can be taken by either party and may be oral. It is an objection to a juror *for which no reason need be given,* but upon which the court *must* exclude him." (Italics added.) The majority now changes this rule and, for the first time, requires a justification, excuse, or explanation for use of a *peremptory* challenge.

The majority accepting, as it must, the statutory definition of a peremptory challenge contained in section 1069 nonetheless holds: "It is true that the statute defines such a challenge as one for which 'no reason need be given' (*id.,* § 1069) but it does not follow therefrom that it is an objection for which no reason need exist." (*Ante,* p. 274.) This suggests that a reason must exist but need not be "publicly stated." (*Ante,* p. 275.) This rather startling conclusion requires considerable reflection.

Ostensibly, the new principles which the majority adopts are necessary to "vindicate" a defendant's right to an impartial jury. I believe the concepts advanced by the majority are wholly antithetic to procedural rules which governed civil and criminal trials for many years. Further, rather than guaranteeing an impartial trial, I think the only guarantee is that the present lengthy process of voir dire will be rendered lengthier still. In my opinion, the majority position is wrong in concept and will prove illusory and unworkable in application.

Preliminarily, two important features of the majority's holding should be stressed and their implications fully understood in evaluating both its wisdom and its reach. First, it applies in criminal cases to both prosecution and defense. (*Ante,* p. 276.) Second, although the majority limits application of the new principles to criminal cases and leaves "to another day" a determination of whether the new rules apply to civil cases, the "functions" of a jury, which the majority treats as controlling, seem remarkably similar in civil and criminal cases, leading me to conclude that, given the issue in a civil context, the majority will reach the same result. This probability underscores the seriousness of the sweeping procedural changes today worked by the majority.

In my opinion, any analysis of the issue should begin, not end, with a consideration of the single most persuasive, if not controlling, case on the point, namely, *Swain* v. *Alabama* (1964) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824]. In *Swain* the United States Supreme Court dealt squarely with the use of peremptory challenges to eliminate black jurors from a petit jury which was to try a black defendant. In its affirmance of the underlying conviction the high court stressed the importance of the use of the peremptory challenge in impanelling impartial jurors while describing the practical considerations which affect its exercise.

Referring to the peremptory challenge, the *Swain* court said: "The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that 'to perform its high function in the best way "justice must satisfy the appearance of justice." ' [Citation omitted.]" (P. 219 [13 L.Ed.2d p. 772].) . . . "The essential nature of the peremptory challenge is that it is one exercised *without a reason stated, without inquiry and without being subject to the court's control.* [Citations omitted.] While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, *the peremptory permits rejection for a real or imagined partiality* that is less easily designated or demonstrable. [Citation omitted.] . . . [A peremptory challenge] is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. *For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be.* . . . Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, *which may include their group affiliations, in the context of the case to be tried.*" (Pp. 220-221 [13 L.Ed.2d pp. 772-773], italics added.)

By its decision in *Swain* the United States Supreme Court recognized that in the appropriate circumstances the race as well as religion, sex, nationality, occupation, or affiliation of prospective jurors are trial-related considerations which may constitute proper reasons for the exercise of the peremptory challenge.

The importance of *Swain* as authority cannot be disputed. It has been said that "In all of the cases in which the courts have considered the constitutionality of the prosecution's use of the peremptory challenge in a single case against blacks, the courts have reached the same conclusion as the Supreme Court in the Swain decision, . . ." (Annot. (1977) 79 A.L.R.3d 17 at p. 19.) So far as I can learn, the majority's new rules find no judicial acceptance anywhere.

We ourselves have consistently followed *Swain* and have denied hearing in several recent cases raising the precise present contention. (See *People* v. *Allums* (1975) 47 Cal.App.3d 654, 663-664 [121 Cal.Rptr. 62], hg. den., cert. den., 423 U.S. 934 [46 L.Ed.2d 266, 96 S.Ct. 291] [defendant must show systematic exclusion of blacks "over a period of time"]; *In re Wells* (1971) 20 Cal.App.3d 640, 647-648 [98 Cal.Rptr. 1], hg. den. [same].) Moreover, the majority errs in suggesting that the issue is one of first impression. Indeed, we have quoted from *Swain* with approval in rejecting a similar contention regarding the prosecutor's use of peremptory challenges to exclude jurors with negative views concerning the death penalty. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 727 [83 Cal.Rptr. 608, 464 P.2d 64].)

In *Floyd*, we carefully explained that "we cannot engage in conjecture regarding the prosecutor's reasons for exercising some of his peremptory challenges . . . . Instead, we must assume 'that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged.' [Citing *Swain.*] *Swain* held that the prosecutor could properly exclude all Negroes from a particular jury, regardless of the factual basis for his belief that such jurors, either as individuals or as a class, might be biased in the particular case to be tried. As the court stated, '*In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case.*' [Citing *Swain.*]" (*People* v. *Floyd, supra,* at pp. 727-728, italics added.)

The majority now insists that the petit jury exhibit the same "representative" characteristics which heretofore have been required exclusively of the *jury pool* or jury venire. This is a totally novel proposition and makes for unwieldy, unworkable results. *Without exception* all of the authorities relied upon by the majority involve the compositions of grand juries or jury venires. The salutary principles

expressed in these cases are unhelpful in the consideration of *petit* juries. Nonetheless, the majority mandates that the representation required of the jury venire from which the trial jury is chosen also be applied to those persons actually seated. The majority reasoning relies for support on cases such as *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]. The express language of *Taylor* repudiates such an equation. "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, [citations omitted] but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." (P. 538 [42 L.Ed.2d pp. 702-703].)

I suggest that the foregoing *Taylor* rule is the only feasible rule, given the element of chance which necessarily, and properly, is injected in the process through use of the jury wheel. For although the jury *panel* sitting in the courtroom may reflect to perfection the economic, social, occupational, sexual, religious, and cultural community from which it is drawn, once the jury wheel is turned and the first names are drawn the situation is changed. Fate takes a hand. The first 12 names drawn may be all men, or all women, all black or all white, all from the poor, or from the wealthy class. The exercise of the peremptory challenge by both sides is directed to 12 persons who may not be, at any given time, "representative" of either the community or the venire. It is not the true function of peremptories to "restore" any balance, but rather, to the extent humanly possible to attain *impartiality.* Thus the true rule and goal should be that while the jury venire, or pool, or reservoir must be "representative" the trial jurors must be "impartial."

Henceforward, under the majority's holding any peremptory challenge "on the ground of group bias" will be deemed to violate the right to a jury trial under the California Constitution because it does not permit "a jury drawn from a representative cross-section of the community." (*Ante,* p. 277.) I find no legal precedent for such a proposition. In any event, the majority now insists "that a party is constitutionally entitled to a *petit jury* that is *as near an approximation of the ideal cross-section of the community as the process of random draw permits.*" (*Ante,* p. 277, italics added.)

The majority repeatedly refuses to recognize the established distinction between the jury venire and the petit jury. It attempts to render synonymous the terms "representative" and "impartial" insisting that the true guarantor of impartiality is a mixing of representative groups "so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." (*Ante,* pp. 266-267.) I totally, and fundamentally, disagree that this is either the function or the goal of the jury selection process.

Dissension, to the extent that it reflects only a clash of the "respective biases" of individual jurors, is no guarantee whatever of impartiality. Impartiality is not assured by balancing "biases." Quite the opposite. Such disagreement may indicate that individual prejudices so control the jurors that they are incapable of viewing the issues before them dispassionately. Such disharmony may make a unanimous verdict an impossibility from the outset thus rendering the criminal trial a futile exercise. Surely, one of the specific purposes of voir dire is to allow counsel to identify those in the venire whose biases hold such sway over their thinking and to eliminate them from the jury.

In Ginger, Jury Selection in Criminal Trials (1975), one informed source is noted at page 281: "The real and realistic aim of our jury selection method is not to achieve the impossible complete impartiality but rather to minimize the range of predispositions that may influence the jury's verdict. Conceptually, we can rank the members of a jury venire in a spectrum that ranges from those most predisposed toward the plaintiff to those most predisposed toward the defendant. The purpose of the voir dire proceedings is to eliminate from the jury that will sit on the case the extreme positions on both sides of the spectrum."

A heavy responsibility rests upon a trial lawyer in a criminal case, whether prosecution or defense. The factors which prompt counsel to exercise a peremptory challenge may be very subtle. The lawyer's antenna is alert for signals. The prospective juror's hesitancy in answer, the tone of the voice, the nature of the response, whether warm or metallic, a stare, a set of the jaw, a partial smile or frown, may be revealing to a seasoned lawyer. These physical signs will not appear in a cold record.

Counsel, knowing the issues and witnesses, the probable evidentiary flow and interplay of emotion, and the strength and weaknesses of his case and that of his opponent, may believe that his client may get more or

less fair and impartial treatment from members of a particular economic class, social group or age classification. His judgment may, for example, tell him that those of a particular religious persuasion will be attracted to or offended by a witness or particular piece of evidence. He may not be able to justify or explain his own strong instincts. His opponent objects on the ground that the challenge stems from "group bias." The judge, as directed by the majority, must question counsel and ask him to explain, at the cost of a wasted jury venire if he is unsuccessful, with attendant expense and delay for litigants, witnesses, and court personnel.

The majority, commendably, recognizes that the real difficulty with its formulation is reached when it considers the matter of the "remedy." These difficulties inhere in requiring judges at the voir dire phase of trial to examine the validity of the subjective motives of counsel in exercising peremptory challenges. With due respect, I suggest that what the majority proposes as a simple straightforward test will, in fact, become all too frequently a time consuming inquiry leading the court, counsel, and litigants into procedural quicksand and a quagmire of questionable efficacy. The majority requires that the challenger's opponent "show a strong likelihood" that group associations alone are the basis of the complained of challenge. The court must then determine whether a "reasonable inference" arises that the challenges are improperly motivated. If a "prima facie" case has been made, the "burden" shifts to the other side to show that the challenges were exercised on grounds "reasonably relevant" to the particular case.

I believe the foregoing proposed test is so vague as to constitute no standard at all. Could not a prosecutor, for example, carry his burden in this regard merely by declaring that his challenges were based upon such considerations as the economic or social (as opposed to racial) backgrounds of those challenged, or some subjective, unprovable suspicion of sympathy for the defendant?

Furthermore, the majority suggests that the foregoing tests may be met by a showing that "most or all of the members of the identified group" (*ante,* p. 280) have been challenged or that a "disproportionate number" of peremptory challenges have been directed at the group, or that counsel's voir dire of the challenged group has been "desultory." The mere recitation of the following three examples illustrates the difficult burdens which the majority has imposed. If the victim in a robbery case is elderly and the contention is that the young have been systematically challenged, a statistical age profile of the venire would have to be compiled and

preserved to determine whether "most" of the number had been excused. Furthermore, this will have to be done "after the event," for previously challenged prospective jurors will have been excused and long since will have left the courtroom. This will require a continued monitoring and recording of the "group" composition of the panel present and prospective, all before the group in question has been even identified. If the group allegedly being excluded in a white-collar crime prosecution is the poor, would not an income or wealth comparison presumably have to be available to the judge in order to determine if other venire members of that group had been subjected to more vigorous or extended voir dire questioning. Similarly, in a sex case if the contention is that women or members of particular religious bodies have been subject to peremptory challenge, would not the sexual or religious composition of the venire have to be recorded or developed for the judge to decide the issue?

The majority's rules place the court in a difficult, indeed precarious, position. It is a fundamental principle of our trial system that it is the litigants who pick, and must be satisfied with, the jury. The court can rarely have the intimate knowledge of the case possessed by the parties and a jury with which the court is happy may not be a jury with which either the district attorney or the defense can reasonably be comfortable or satisfied.

In the event either prosecutor or defense counsel has improperly exercised a peremptory challenge, the jurors theretofore chosen are to be dismissed along with the entire remaining venire. The majority deems the foregoing a sufficient deterrent to "the abuses of the peremptory challenge," adding, "if experience should prove otherwise it will be time enough then to consider alternative penalties." (*Ante,* p. 282.) The ominous overtones of this warning will not be lost on counsel, both prosecution and defense.

Unlike almost every other area of the criminal justice system in the matter of jury selection there is no inherent or gross disparity between the power and the resources of the People and those of the defense. Each side has an equal opportunity to challenge and the end result is the most satisfactory jury that can be drawn from the venire, for it is not only the fact but the appearance of prejudice which may disqualify a juror. It is the probable rather than the provable fact of prejudice which impairs the legitimacy of the jury. In the matter before us there is no suggestion that the jury was not impartial. On the contrary, the record indicates that defendants did not exhaust their peremptory challenges. Although the

defense exercise of peremptory challenges could not replace any jurors theretofore challenged by the prosecution, failure to exhaust their own peremptories suggests to me defense satisfaction with the jury as then comprised. There remained unused several opportunities by which the composition of the jury could have been altered by the defense.

There is a clear salutary effect which peremptory challenges have in assuring an impartial petit jury. The challenge is an important tool for trial lawyers who, bearing heavy responsibilities to their clients, should remain free and unfettered to do their essential job. The legal precedents, notably *Swain,* are compelling. The practical difficulties in administering the majority's scheme are complex.

I would affirm the judgment.

Clark, J., concurred.

The petitions of all the parties for a rehearing were denied October 25, 1978. Clark, J., and Richardson, J., were of the opinion that the respondent's petition should be granted.