[No. B170806. Second Dist., Div. Four. Feb. 17, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
COREY BOULDEN et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, V, and VI of the Discussion.

COUNSEL

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant Corey Boulden.

Janice Wellborn, under appointment by the Court of Appeal, for Defendant and Appellant Marquis Land.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Herbert S. Tetef, Lawrence M. Daniels and Jennifer A. Jadovitz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CURRY, J.**—Appellants Marquis Land and Corey Boulden,[1] along with codefendant James Boulden,[2] were charged and convicted of first degree

---

[1] Corey Boulden's name was spelled "Bolden" in the information. However, we adopt for purposes of this appeal the spelling contained in his brief on appeal and the abstract of judgment.

[2] James Boulden appealed separately in case No. B169371. Because they share the same surname, James and Corey Boulden will be referred to herein either by their full names or their first names.

burglary (Pen. Code, § 459)[3] and attempted first degree burglary (§§ 664 & 459).

Land was charged separately with one count of providing false information to a police officer (§ 148.9, subd. (a)), a charge that was subsequently dismissed. In addition, it was alleged that he had suffered two serious felony convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (a)–(i), 1170.12, subds. (a)–(d)), and had served two terms in state prison within the meaning of section 667.5, subdivision (b). Land's motion to sever his trial was denied.

With respect to Corey Boulden, it was alleged that he had suffered one prior felony conviction within the meaning of the Three Strikes law, and that he had served two prior prison terms in state prison within the meaning of section 667.5, subdivision (b).

After the jury rendered its verdict, the court found the allegations of prior convictions and prison terms to be true. The court denied Land's motion to strike a prior conviction or convictions. He was sentenced to a state prison term for a period of 60 years to life, based on: (1) an indeterminate term of 25 years to life on count one; (2) an indeterminate term of 25 years to life on count two to run consecutively; (3) two 5-year enhancements for the two prior serious felony convictions (§ 667, subd. (a)) to run consecutively. Land was credited with 303 days based on 264 days in actual custody and 39 days good time/work time.[4]

Corey Boulden's motion to strike a prior was also denied. He was sentenced to 15 years, eight months, consisting of: (1) four years doubled to eight years for count one; (2) 16 months doubled to 32 months (or two years, eight months) for count two; and (3) an enhancement of five years for the prior serious felony, all to run consecutively. He received 360 days of presentence credit based on 256 days in actual custody plus 50 days of good time/work time credit.

Land and Corey Boulden filed timely notices of appeal.

### EVIDENCE AT TRIAL

Lorraine Adrid, who lived in the 1400 block of West O'Farrell Street[5] in San Pedro, left for work on January 27, 2003, at around 8:00 a.m. Her

---

[3] Unless otherwise indicated, all statutory references herein are to the Penal Code.

[4] The abstract of judgment states that Land received 36 days good time/work time credit and a total of 300 days presentence credit.

[5] West O'Farrell Street is referred to herein as "O'Farrell."

100-pound German Shepherd dog was inside the house. Later in the day, she heard about suspected burglaries in the area, and left work to talk to the police. When she arrived back home, she noticed that the sliding glass door in the back of her house was out of place, as though someone had tried to pry it open. In addition, the screen was open. But she saw no evidence that anyone had gotten inside.

Stanley Nowinski lived on the 1400 block of O'Farrell, near Adrid. On January 27, 2003, he left his house at around 6:30 a.m. His wife left later. When Nowinski left, he checked that all the doors were locked except the kitchen door, which his wife generally locked when she left. Between 9:00 and 9:30 a.m., he received a call, and returned home. When he got there, the police were inside and most of the rooms were in disarray. The back window and back door of the house were open. The window screen had been taken out. Someone had left a screwdriver that did not belong to Nowinski near the window. There was a pair of Nowinski's gloves left on top of the trash bin in the backyard. Several items were in a duffle bag by the back door, such as video game systems, coins, and a bottle of champagne. Nowinski was not sure if any items were actually missing from the house. His backyard opens onto an alley, and the gate is generally left open.

Douglas Shelton lived on the 1300 block of O'Farrell. He went to work on the morning of January 27, 2003, but returned home at around 9:30 a.m. to pick up his cell phone. He noticed three men walking on the 1400 block, at least two of whom were African-American. The other was either African-American or Hispanic. The men seemed to be checking out the houses on the street. Shelton did not remember seeing them in the neighborhood before. He decided to attempt to follow them after retrieving his cell phone from his house. He drove past a man sitting in a black car parked on O'Farrell near Harbor View. He identified the man in court and in an earlier photographic lineup as James Boulden. Shelton could not tell if James was one of the three men he had seen earlier. He did not see James communicate with any other person. Shelton circled the area, and noticed when he got back to O'Farrell that the black car had moved and was parked on Harbor View near an alley. Shelton called 911 and described the men he had seen.

Ron Armesto lived on Sepulveda Street, in back of Nowinski's house. He was working in his garage at around 9:00 or 9:15 on the morning of January 27, 2003. His garage opens onto an alley. He saw three African-American men walking up the alley toward Harbor View. He stepped out of his garage to see where they were going. About 15 to 20 minutes later, he saw two of them running up the alley in the same direction. He did not hear any noise from any of the nearby houses during that period. He was, however, using a band saw, drill, and other noisy power equipment during that period. He

identified the two men he saw running up the alley as Marquis Land and Corey Boulden. He could not identify James Boulden as the third man he had seen earlier walking with the two.

On January 27, 2003, Rodrigo Escamilla, a gardener, was working in the 1400 block of O'Farrell. He started work at around 8:00 or 9:00 a.m. He observed a small black car containing three African-American men park on nearby Harbor View. The men walked down O'Farrell. Escamilla next saw them walk out of an alley between O'Farrell and West Sepulveda towards him. They were not carrying anything in their hands. One of the men asked for a drink of water from Escamilla's hose. The man who asked for water looked like James Boulden. The black car was moved from Harbor View to O'Farrell, closer to Escamilla's truck where he stored his tools. Escamilla became suspicious and wrote the car's license plate on his hand. The car was moved again, and about five or 10 minutes later police officers came by. The officers asked Escamilla if he had seen anything, and he described the car to them, including the license plate. While he was talking to the officers, two men came out of the alley and ran toward Sepulveda. The officers followed them. Escamilla could not tell for sure if they were the same men he had seen before, but told the officers at the time that he thought they might be. Later, after things calmed down, Escamilla saw the black car again, parked in another location on O'Farrell. Escamilla was able to identify the car from a photograph shown to him in court.

Officer Phillip Tingirides responded to a call concerning a possible burglary at around 10:00 a.m. When the officer arrived on the scene, Escamilla showed him the license plate number he (Escamilla) had written on his hand. The officer saw two men run out of the alley, and he broadcast their general description. He identified one of the men in court as Corey Boulden. At the preliminary hearing, however, he mistakenly identified James Boulden as one of the two men he had seen running. The officer attempted to keep visual contact with the two men as they continued to run. He later heard that three suspects had been detained.

Officer Andrew Simon heard a radio call concerning burglary suspects in the area of the 1400 block of O'Farrell at around 10:10 a.m. He arrived at the scene, and observed two African-American men climbing a wall or fence from a yard to the alley near O'Farrell, apparently from the Nowinski backyard. He identified Land as one of the men. He identified the other as Corey Boulden. Officer Simon detained Corey Boulden a few minutes later in the 1300 block of Sepulveda.

Officer Bruce Nelson, responding to a radio call a little after 10:00 a.m., saw a black car parked on O'Farrell. He pulled up behind and saw "a head

pop up from down below." Officer Nelson took the man into custody. He was identified as James Boulden. Officer Nelson also gave chase to and detained Land about 10 minutes later, while he was running between houses near Sepulveda. Officer Nelson searched the black car but did not find any stolen items.

Detective Fred Mannion showed photographic six-packs to Armesto and Shelton. Shelton identified the driver of the black car as James Boulden. Armesto identified Land and Corey Boulden. Detective Mannion spoke to James after reading him his rights. James admitted that the black car belonged to him. A knife and screwdriver were found in the car.[6] There was no attempt to match the screwdriver to any marks at the impacted houses. None of the three defendants' prints appeared in the houses or on any dislocated items. There was no cell phone, pager, or walkie-talkie found in the car or on any of the three defendants.

Ann DeYoung, forensic print specialist, was unable to find liftable prints at the Nowinski house. There were glove marks on some items. Two prints were obtained from the area of the attempted entry at the Adrid house.

The defense called Shatonia Stokes and Tyesha Sowell. Stokes lived near the area of the burglary. Sowell, Land's cousin, was staying with Stokes. They both testified that Stokes had made arrangements with Land for him to visit Sowell at Stoke's house on the morning of January 27, 2003. He never arrived.

## DISCUSSION

### I

■ On the first day of trial, the parties and the judge were discussing how many challenges each side would have and how many potential jurors should be called for voir dire. The court indicated a belief that only 35 or 40 potential jurors would be needed and stated: "As I indicated earlier, I'm ordering each of you not to violate *Wheeler.*" The court was referring to *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], the landmark case in which the Supreme Court held that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community" under article I, section 6 of the California Constitution. (22 Cal.3d at pp. 276–277.)

---

[6] The defense objected to the admission into evidence of these items on grounds of relevancy and prejudice, but the court admitted them.

■ The court's decision to issue an order instructing counsel to avoid *Wheeler* violations may have derived from our opinion in *People v. Muhammad* (2003) 108 Cal.App.4th 313 [133 Cal.Rptr.2d 308]. That decision came about as a result of a flaw in the original remedy laid out by *Wheeler* to be applied where the trial court realizes that counsel is exercising peremptory challenges in order to remove jurors who belong to a suspect class or other identifiable group. Whenever that occurred, "[t]he court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected. So too it must quash any remaining venire . . . . Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew." (*People v. Wheeler, supra*, 22 Cal.3d at pp. 280–282.)

In *People v. Willis* (2002) 27 Cal.4th 811 [118 Cal.Rptr.2d 301, 43 P.3d 130], the Supreme Court explained how application of that remedy could lead to anomalous results. In *Willis*, the attorney for the defense objected to the entire panel of potential jurors as being unrepresentative of the community at large because it contained few non-Whites and not one Black. The trial court overruled the objection and required voir dire to proceed. Thereafter, defense counsel repeatedly challenged White males. The trial court found systematic exclusion of White males without justification, and admonished defense counsel " 'not to violate *Wheeler* again' " under threat of " 'personal monetary sanctions.' " (*Id.* at p. 815.) The court did not, however, excuse the venire.

On appeal, the Court of Appeal held that the trial court had no choice under *Wheeler* but to dismiss the entire venire, acknowledging that the remedy " 'encourages both parties, if dissatisfied with the venire or the petit jury as it develops during the selection process, to violate the [*Wheeler*] rule so they can try and mold a new panel more to their liking . . . encouraging rather than deterring . . . violations.' " (*People v. Willis, supra*, 27 Cal.4th at p. 817.) Although the Supreme Court reversed the Court of Appeal, it agreed that the described problem existed and concluded that a new discretionary remedy short of dismissal of the entire venire was needed because "situations can arise in which the remedy of mistrial and dismissal of the venire accomplish nothing more than to reward improper voir dire challenges and postpone trial." (*Id.* at p. 821.)

■ To prevent gamesmanship, the Supreme Court proposed the following alternative remedies: "Under such circumstances [where venire dismissal would reward challenges geared toward provoking such dismissal], and with the assent of the complaining party, the trial court should have the discretion to issue appropriate orders short of outright dismissal of the remaining jury, including assessment of sanctions against counsel whose challenges exhibit

group bias and reseating any improperly discharged jurors if they are available to serve. In the event improperly challenged jurors have been discharged, . . . the court might [also] allow the innocent party additional peremptory challenges. [Citations.] [¶] Additionally, to ensure against undue prejudice to the party unsuccessfully making the peremptory challenge, the courts may employ the . . . procedure of using sidebar conferences followed by appropriate disclosure in open court as to *successful* challenges. [Citation.]" (*People v. Willis, supra,* 27 Cal.4th at p. 821.)

 The court in *Willis* noted that "[t]he complaining party [in the case before it] was the prosecution, which waived its rights to a new venire in favor of sanctioning defense counsel and continuing the proceedings." (*People v. Willis, supra,* 27 Cal.4th at p. 823.) On balance, it appeared to the court "more appropriate, and consistent with the ends of justice, to permit the complaining party to waive the usual remedy of outright dismissal of the remaining venire." (*Ibid.*) The court "stress[ed] that such waiver or consent is a prerequisite to the use of such alternative remedies or sanctions, for *Wheeler* made clear that 'the complaining party is entitled to a random draw from an entire venire' and that dismissal of the remaining venire is the appropriate remedy for a violation of that right. [Citation.] Thus, trial courts lack discretion to impose alternative procedures in the absence of consent or waiver by the complaining party." (*Id.* at pp. 823–824.)

In *People v. Muhammad, supra,* 108 Cal.App.4th 313, this court was called on to decide whether the trial court had properly imposed monetary sanctions for a perceived *Wheeler* violation on the part of the prosecution. The court had granted a defense motion for mistrial and dismissed the venire, based on the prosecutor's unjustified peremptory challenges. The court then issued an order to show cause why the prosecutor should not be sanctioned $1,500 under section 177.5 of the Code of Civil Procedure, and after hearing, ordered the sanctions imposed. We concluded that Code of Civil Procedure section 177.5 did not apply in the absence of a preexisting order,[7] and reversed. In so holding, we said: "Certainly if a court admonishes counsel that a repetition of specific conduct will result in a monetary sanction, that statement is tantamount to an order not to repeat the conduct, and should suffice under section 177.5. . . . [¶] . . . [¶] . . . What should a trial court do in order to preserve the option of imposing a monetary sanction should the conduct of counsel merit that option? Make an order. Yet it seems degrading to the judicial process and to the attorneys who practice before our courts for a court to have to warn counsel that, on penalty of a monetary sanction, they must not violate the Constitution. Based on our reading of *Wheeler* cases in

---

[7] Code of Civil Procedure section 177.5 provides that a judicial officer has the power to impose monetary sanctions of up to $1,500 "for any violation of a lawful court order by a person, done without good cause or substantial justification."

the literature, it appears that the issue usually is raised more than once if it is raised at all, thus giving the court an opportunity to issue an appropriate admonition." (108 Cal.App.4th at pp. 325–326.)

Citing *Muhammad*, appellants here point out that the trial court's order not to violate *Wheeler* contained an implicit threat to impose monetary sanctions of up to $1,500 if counsel wrongly challenged venire members. They contend that such an order creates a conflict of interest between defendants and defense counsel, in that defense counsel might be less than zealous in exercising peremptory challenges due to fear of incurring the wrath of the court. If counsel succumbs to such fear, there would be a potential negative impact on defendants' right to counsel. We disagree.

As can be seen, the decisions in both *Willis* and *Muhammad* expect that occasions will arise when counsel will come under threat of monetary sanctions for future violation of *Wheeler*. Neither this court nor the Supreme Court deemed such a possibility to be a serious impediment to a defendant's right to zealous representation by counsel. This is because a lawyer's duty " 'to represent his client zealously' " must take place " '*within the bounds of the law.*' " (*People v. McKenzie* (1983) 34 Cal.3d 616, 631 [194 Cal.Rptr. 462, 668 P.2d 769].) In issuing its order here, the trial court sought merely to ensure that counsel act within the boundaries of *Wheeler* when exercising peremptory challenges—something counsel was already required to do with or without a court order.

 Concededly the decisions in *Willis* and *Muhammad* anticipated that the order containing the threat of sanctions would issue *after* problematic conduct on the part of counsel became evident during voir dire. Here, the court employed a prophylactic order prior to any misbehavior, intending to forestall a *Wheeler* problem. Although we have found no specific authority approving this procedure, it is generally recognized that " ' "the trial judge [has] the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused." ' " (*People v. Shelley* (1984) 156 Cal.App.3d 521, 530 [202 Cal.Rptr. 874].) " 'In order to implement this duty, the trial judge is vested with both the statutory and the inherent power to exercise reasonable control over all proceedings connected with the litigation before him.' " (*Ibid.*) This means that " 'the court has the authority " 'to take whatever steps [are] necessary to see that no conduct on the part of any person obstruct[s] the administration of justice.' " ' " (*Ibid.*) In this case, because of the multitude of parties in the case and the number of peremptory challenges allowed each side, the court acted reasonably to avoid predictable problems in jury selection. We find no fault in the court's actions.

II–VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Marquis Land's abstract of judgment is ordered modified to reflect 396 days of presentence credit consisting of 264 days of actual credit and 132 days of conduct credit. Corey Boulden's abstract of judgment is ordered modified to reflect imposition of a sentence of 16 months (1 year, 4 months) for count two, attempted burglary, and 384 days of presentence credit consisting of 256 days of actual credit plus 128 days of conduct credit. As modified, the judgments are affirmed.

Epstein, P. J., and Grimes, J.,† concurred.

A petition for a rehearing was denied March 21, 2005, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied July 13, 2005. George, C. J., did not participate therein.

---

*See footnote, *ante*, page 1305.

†Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.