Filed 2/26/14  P. v. Martinez CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056034 |
| v. | (Super.Ct.No. RIF1100168) |
| FERNANDO MARTINEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael B. Donner and Michele D. Levine, Judges.  Affirmed in part; remanded for resentencing.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Fernando Martinez was charged with one count of possession of methamphetamine in a prison.  (Pen. Code, § 4573.6.)[1]  The information also alleged that defendant had served one prior prison term and that he had suffered three prior serious felony convictions.  (§§ 667.5, subd. (b); 667, subds. (c), (e)(2)(A); 1170.12, subd. (c)(2)(A).)  A jury found him guilty, and the trial court found the prior conviction and prior prison term allegations true, based on defendant's admissions.  The court sentenced defendant to a term of 25 years to life, with a concurrent term of one year for the prior prison term enhancement.  Defendant appeals, asserting a variety of errors.  We will affirm the conviction.  We will, however, remand the cause for resentencing pursuant to section 667, subdivision (e)(2)(C).

## FACTS

Defendant was an inmate at the California Rehabilitation Center.  On July 27, 2010, Correctional Officer Motto conducted a security check in Dorm 203.  Defendant was seated on his assigned bunk.  There were two other inmates in the area.  Inmate Rodriguez was lying on his assigned bunk.  An unidentified inmate was watching television with Rodriguez.

While he was dealing with the other two inmates, Motto noticed that defendant's body was shaking.  His hands were shaking as he was writing on a notepad.  When Motto requested defendant's identification card, defendant jumped up and then stumbled and fell, catching himself on the bed.  Based on his training, Motto suspected that defendant

_____

[1] All further statutory citations refer to the Penal Code unless another code is specified.

2

was under the influence of a drug.  At some point, defendant picked up two out of the 30 or so CD cases which were on his bunk.  He held them flat, like a tray.  Motto ordered him to put them down, and defendant complied.  Motto wondered why defendant would pick up just two of the CD cases.  He suspected there might be contraband in the area.

Motto called for other officers.  When he put defendant's hands in restraints, he noticed blood running down defendant's arm from the inner elbow area.  Motto suspected the blood came from a puncture wound associated with drug use.  Other officers took defendant away.  Motto picked up the two CD cases defendant had been holding and found a white crystal substance between the two CD cases.  Motto applied a field test which returned a positive result for methamphetamine.  This preliminary result was later confirmed.  The crystal substance contained a useable quantity of methamphetamine.

After being read his *Miranda*[2] rights, defendant told Officer Boyd that he had injected heroin into both arms.  He told a registered nurse who examined him that he was under the influence of heroin.  The nurse observed that he had new needle marks on both arms.  The nurse testified that defendant's pulse and blood pressure were consistent with methamphetamine use but not with heroin use.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

1.

THE COURT PROPERLY DENIED DEFENDANT'S *BATSON-WHEELER* MOTION

Defendant claims the trial court erred in denying his motion under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) based on the prosecutor's exercise of peremptory challenges to excuse four prospective jurors with Hispanic surnames.

The issue arose as follows. Defendant made a *Batson-Wheeler* motion concerning the number of peremptory challenges exercised by the prosecution against Hispanic jurors. Among the 11 peremptory strikes exercised by the prosecutor up to that point, four were exercised against prospective jurors with Hispanic surnames: Martinez, Santos, Orozco and Sanchez. The court asked the prosecutor for her reasons for discharging the four prospective jurors. The prosecutor stated that she discharged Ms. Martinez because she had a cousin who was then in prison. She discharged Mr. Santos because he was unemployed and because he had been giving her "inappropriate looks," "undressing [her] with his eyes." She discharged Mr. Orozco because he had a family member then in prison. She stated, "I've kicked everybody who's had a family member in prison." She discharged Ms. Sanchez because she was a social worker who "might have a bleeding heart for the fact that [defendant] might have drug abuse problems." In addition, Ms. Sanchez had a family member then in prison.

4

The court asked defense counsel to respond. Counsel submitted without argument. The court then stated that it did not find sufficient information to suggest that a member of a protected class was being discharged for inappropriate reasons.

Defendant now contends that the record shows that the prosecutor's stated reasons were pretextual because, contrary to her statement that she had "kicked" every prospective juror who had a relative in prison, she in fact accepted several other prospective jurors who also had family members then in prison or family members who had been in prison in the past. Moreover, he contends that the trial court failed to discharge its duty to evaluate the "subjective genuineness" of the prosecutor's race-neutral reason for the peremptory challenges, particularly with respect to Mr. Santos, the juror who was allegedly "undressing [the prosecutor] with his eyes."

The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution. (*People v. Taylor* (2010) 48 Cal.4th 574, 611 (*Taylor*).) The procedure and standards courts use with respect to motions challenging peremptory strikes are stated in *Batson*, *supra*, 476 U.S. 79 and were reiterated by the United States Supreme Court in *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*): "First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State

5

to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, [i]f a race-neutral explanation is tendered, the trial court must then decide [] whether the opponent of the strike has proved purposeful racial discrimination." (*Id*. at p. 168, internal quotation marks and citations omitted for clarity.)

If, as in this case, the trial court asks for an explanation of the prosecutor's reasons for the challenges, whether the defendant established a prima facie case may be moot. (*Taylor*, *supra*, 48 Cal.4th at p. 612.)  If so, the reviewing court proceeds to the third step of the *Batson* analysis, to determine whether the record supports the prosecutor's race-neutral explanations.  (*Ibid*.)  This is the test defendant asks us to apply.  However, asking the prosecutor for an explanation does not automatically mean that the trial court implicitly found that the defendant made a prima facie showing.  (*Ibid*.)  Here, rather than engaging in any analysis of the prosecutor's explanations, the trial court concluded only that there was not "sufficient information or evidence to suggest" purposeful discrimination.  Defendant contends that this means that the trial court failed to discharge its duty to "evaluate the 'subjective genuineness'" of the reasons given for the peremptory challenge.  We disagree.  The court's finding that there was insufficient evidence to suggest purposeful discrimination does not refer to the sufficiency of the prosecution's explanations.  Rather, it refers to the first prong of the *Batson* analysis, i.e., the defendant's burden to make out a prima facie case by showing that "'the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" (*Johnson*, *supra*, 545 U.S. at p. 168.)  Accordingly, "'examining the court's remarks in context'" (*Taylor*,

6

at p. 612), we conclude that the trial court found that defendant failed to make a prima facie showing.

Having determined that the trial court found that the defendant failed to make a prima facie showing of purposeful discrimination, we review the record independently to decide "'the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of'" membership in a protected class. (*Taylor*, *supra*, 48 Cal.4th at p. 614, citation omitted.) Under *Johnson*, *supra*, 545 U.S. 162, a defendant satisfies the first prong of *Batson* "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson*, at p. 170.) The defendant "should make as complete a record of the circumstances as is feasible." (*Wheeler*, *supra*, 22 Cal.3d at p. 280.)

In *Taylor*, *supra*, 48 Cal.4th 574, the court noted that the defendant's showing was inadequate because he merely pointed out that the prosecutor had dismissed a single African-American woman and submitted that question on that basis alone, without referring to the juror's questionnaire or voir dire answers, responding to the prosecutor's stated reasons for the excusal, or pointing to any other evidence that would permit an inference of discrimination. (*Id.* at p. 614.) Defendant's showing in this case was equally deficient. Defense counsel stated only that he was making a *Wheeler-Batson* motion "[r]egarding the number of Hispanics that are being challenged by the prosecution." He did not respond to the prosecutor's reasons for the challenges when the court invited him to do so, nor did he point to any evidence, other than the bare fact of the

7

four challenges to Hispanic surnamed jurors, that would permit an inference of discrimination.  Rather, he merely submitted.

Our independent review of the record supports the trial court's conclusion that there was insufficient evidence of purposeful discrimination.  In addition to the three Hispanic surnamed jurors the prosecutor dismissed because they had a relative or friend in prison, the prosecutor also dismissed a prospective juror with a non-Hispanic name—Mahdi Sarsak—whose uncle was then in prison.  The record does not suggest any other reason for excusing Mr. Sarsak.  Two other jurors who had relatives who had been in prison in the past were not excused by the prosecutor.  Juror No. 4 was accepted onto the jury even though she stated that she had visited a relative in prison several years before.  The prosecutor accepted the jury without excusing Thomas Griffin, whose brother-in-law had been in prison 20 years earlier.[3]  The prosecutor could validly distinguish between jurors who at the time of trial had a friend or relative in prison and jurors whose friend or relative had been in prison in the past.  Defendant asserts, however, that the prosecutor's statement that she had "kicked everybody who's had a family member in prison," indicated that she was not making such a distinction.  We do not agree that the prosecutor's statement unambiguously supports defendant's interpretation.  Had defense counsel challenged the prosecutor on that point during the hearing on the motion, the prosecutor might have explained that she was excusing only jurors with friends or relatives currently in prison.  Furthermore, the record does not reveal the ethnicity of

---

[3] Mr. Griffin was excused by the defense, as was LaTonya Taylor, whose nephew was then in prison.

8

Juror No. 4, who was not excused by the prosecutor. We have no reason to assume that Juror No. 4 was not Hispanic, which would further undermine the sufficiency of the evidence of purposeful discrimination.

Indeed, we do not know the ethnicity of *any* of the jurors who were ultimately chosen to serve; those jurors are identified in the record only by number. In determining whether a prima facie showing of purposeful discrimination has been made, it is relevant "whether the record shows that the prosecutor struck all or most of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group." (*Taylor*, *supra*, 48 Cal.4th at p. 615, internal quotation marks and citations omitted for clarity.) Because the record does not allow us to make that determination, we cannot say that the record supports an inference of purposeful discrimination. Accordingly, we cannot say that the trial court erred in finding that defendant failed to make a prima facie showing under *Batson*.

2.

## THE TRIAL COURT PROPERLY ADMITTED EVIDENCE CONCERNING AN ATTEMPT BY DEFENDANT'S BROTHER TO SMUGGLE DRUGS TO DEFENDANT

Prior to trial, the prosecutor sought leave to present evidence that in 2006, while defendant was incarcerated at California Men's Colony in San Luis Obispo, he received drugs, including methamphetamine, which were smuggled into the prison by defendant's brother, Francisco Martinez, and transferred to defendant during contact visits. An informant told correctional officers about the smuggling in November 2005. When

9

Francisco Martinez came to visit defendant at the prison on April 2, 2006, he was searched and was found to have methamphetamine and marijuana on his person. The prosecutor argued that the evidence was relevant because it was similar to the conduct charged in the instant case, i.e., possessing methamphetamine while incarcerated, and that it was relevant to prove defendant's knowledge of methamphetamine and its nature as a controlled substance. The trial court agreed that the evidence was relevant and that because it was more probative than prejudicial, it was admissible pursuant to Evidence Code section 1101, subdivision (b).[4] Defendant now contends that this was prejudicial error. We disagree.

Evidence Code section 1101, subdivision (a), provides that, with certain exceptions not relevant here, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Subdivision (b) of that statute provides, however, that "evidence that a person committed a crime, civil wrong, or other act" is admissible when it is "relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident) . . . ." Evidence which is relevant for a purpose sanctioned by Evidence Code section 1101, subdivision (b), must nevertheless be excluded if it contravenes other policies limiting admission, such as those contained in Evidence Code section 352. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)

_____

[4] The court excluded evidence that Francisco Martinez had been convicted in connection with the 2006 smuggling attempt.

Section 352 provides that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Here, defendant concedes that the evidence was at least "minimally relevant" for purposes of Evidence Code section 1101, subdivision (b). He contends only that its probative value was outweighed by extreme prejudice. He does not, however, actually engage in any analysis to support that conclusion. Rather, he assumes that the evidence was so prejudicial as to deny him his due process right to a fair trial. We need not address a contention which is not supported by meaningful analysis and citation to authority. (*People v. Weaver* (2001) 26 Cal.4th 876, 986-987.) Because defendant has not addressed the underlying question of the prejudicial effect of the evidence, we decline to address defendant's contentions that the admission of the evidence was either a prejudicial abuse of discretion or a violation of due process.

3.

THE TRIAL COURT PROPERLY DENIED DEFENDANT'S *PITCHESS* MOTION

Defendant filed a motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) and Evidence Code section 1043 seeking Officer Motto's personnel records. Defense counsel's declaration in support of the motion stated that defendant was not aware of the presence of the methamphetamine Motto discovered and that he believed that Motto planted it. The trial court found this insufficient to establish good cause

11

justifying an in camera review of Motto's personnel records. Defendant now contends that this was an abuse of discretion. We disagree.

A defendant is entitled to discovery of a police officer's confidential personnel records that contain information relevant to the defendant's defense. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538; Evid. Code, §§ 1043-1045.) The procedure requires a showing of good cause for the discovery, an in camera review of the records if good cause is shown, and disclosure of information deemed by the trial court to be "relevant to the subject matter involved in the pending litigation." (Evid. Code, § 1045, subd. (a).) A trial court's ruling on a *Pitchess* motion is reviewed for abuse of discretion. *(Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

In order to establish good cause to compel an in camera review by the court, a defendant must show that the personnel records are material to his or her defense, and must state a reasonable belief that the records contain the type of information sought. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1016.) As part of the good cause showing, a defendant must also "'establish a plausible factual foundation'" for its defense by "present[ing] . . . a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents." (*Id*. at p. 1025.) A scenario sufficient to establish a plausible factual foundation "is one that might or could have occurred" and "presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges." (*Id*. at p. 1026.) In other words, the defense must assert facts concerning the officer's conduct which would support the proposed defense. (See, e.g., *People v. Thompson* (2006) 141 Cal.App.4th 1312, 1317-

12

1318 [upholding the trial court's finding of a lack of good cause where the defendant did not "present a factual account of the scope of the alleged police misconduct, and [did] not explain his own actions in a manner that adequately support[ed] his defense"]; *People v. Sanderson* (2010) 181 Cal.App.4th 1334, 1341-1342 [Fourth Dist., Div. Two] [upholding the trial court's finding of lack of good cause where defendant failed to present "a plausible alternative factual scenario" but in essence merely denied the elements of the charge against him].)

The trial court did not abuse its discretion in finding that defendant did not meet his burden of showing good cause. Defendant's claim that he was not aware of the presence of the methamphetamine and that he believed that Motto planted it was not an "alternative factual scenario" of facts (*People v. Sanderson*, *supra*, 181 Cal.App.4th at p. 1342) that would sustain a defense in this case because defendant did not describe any factual basis for the assertion that Motto planted the drug. Moreover, defendant did not deny the truth of Motto's observation that defendant picked up only the two CDs which happened to contain the methamphetamine, nor did he deny that he displayed symptoms of being under the influence of methamphetamine, as Motto testified at the preliminary hearing. Because defendant provided no factual basis for concluding that Motto planted the drug, his *Pitchess* motion in effect merely denied the possession charge. Accordingly, the trial court properly denied his *Pitchess* motion without an in camera review of Motto's confidential records.

13

4.

DEFENDANT IS ENTITLED TO BE SENTENCED AS A SECOND-STRIKER

UNDER THE THREE STRIKES REFORM ACT

*1. Introduction*

The Three Strikes Reform Act of 2012 (hereafter the Reform Act) was enacted by the electorate on November 6, 2012, and became effective November 7, 2012.  (§§ 667, subd. (e)(2)(C), 1170.12, subd. (c)(2)(C), 1170.126.)[5]  Under the three strikes law as it existed before the passage of the Reform Act, all defendants with two or more strike priors received a sentence of 25 years to life upon conviction of any new felony.  (Former § 667(e)(2)(A).)

As amended, section 667 provides that a defendant who has two or more strike priors is to be sentenced pursuant to paragraph 1 of section 667(e)—i.e., as though the defendant had only one strike prior—if the current offense is not a serious or violent felony as defined in section 667.5(c) or section 1192.7(c), unless certain disqualifying

---

[5]  For convenience, we will dispense with the use of "subdivision" in referring to statutes.  We will also refer solely to section 667(e) in discussing the Reform Act, omitting reference to the substantially identical section 1170.12(c).  However, the analysis applies to both section 667 and section 1170.12.

factors are pleaded and proven.[6]  (§ 667(d)(1), (e)(2)(C).)  The Reform Act also provides

a procedure which allows a person who is "presently serving" an indeterminate life

sentence imposed pursuant to the three strikes law to petition to have his or her sentence

---

[6]  Section 667(e)(2)(C) provides that second-strike sentencing does not apply if the prosecution pleads and proves any of the following:

"(i) The current offense is a controlled substance charge, in which an allegation under Section 11370.4 or 11379.8 of the Health and Safety Code was admitted or found true.

"(ii) The current offense is a felony sex offense, defined in subdivision (d) of Section 261.5 or Section 262, or any felony offense that results in mandatory registration as a sex offender pursuant to subdivision (c) of Section 290 except for violations of Sections 266 and 285, paragraph (1) of subdivision (b) and subdivision (e) of Section 286, paragraph (1) of subdivision (b) and subdivision (e) of Section 288a, Section 311.11, and Section 314.

"(iii) During the commission of the current offense, the defendant used a firearm, was armed with a firearm or deadly weapon, or intended to cause great bodily injury to another person.

"(iv) The defendant suffered a prior serious and/or violent felony conviction, as defined in subdivision (d) of this section, for any of the following felonies:

"(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.

"(II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289.

"(III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.

"(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive.

"(V) Solicitation to commit murder as defined in Section 653f.

"(VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.

"(VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.

"(VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death."

15

recalled and to be sentenced as a second-strike offender, if the current offense is not a serious or violent felony and the person is not otherwise disqualified. The trial court may deny the petition even if those criteria are met, if the court determines that resentencing would pose an unreasonable risk of danger to public safety. (§ 1170.126(a)-(g).) Accordingly, under section 1170.126, resentencing is discretionary even if the defendant meets the objective criteria (§ 1170.126(f), (g)), while sentencing under section 667(e)(2)(C) is mandatory, if the defendant meets the objective criteria.

The intermediate courts have disagreed as to whether the mandatory second-strike sentencing provisions of the Reform Act apply to all qualifying third-strike convictions which were not yet final on November 7, 2012. The issue is on review before the California Supreme Court. (See, e.g., *People v. Conley*, review granted Aug. 14, 2013, S211275 [Reform Act is not retroactive]; *People v. Lewis* [Fourth Dist., Div. Two], review granted Aug. 14, 2013, S211494 [Reform Act applies retroactively]; *People v. Lester* [Fourth Dist., Div. Two], review granted Jan. 15, 2014, S214648 [Reform Act does not apply retroactively].) Defendant contends that the Reform Act applies retroactively. Neither defendant's current offense—possession of a controlled substance in a prison—nor his strike priors—assault with a firearm, attempted robbery and robbery—disqualify him for resentencing pursuant to section 667(e)(2)(C). (See fn. 6, *ante*.) Accordingly, although he was convicted and sentenced before the effective date of the Reform Act, he contends that he is entitled to be sentenced as a second-striker. The Attorney General contends that the Reform Act applies prospectively only.

16

*2. Section 667(e)(2)(C) Applies to Defendants Whose Judgments Were Not Yet Final on the Effective Date of the Reform Act.*

There is a general rule of statutory construction, embodied in section 3 of the Penal Code, that "'when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively.' [Citation.]" (*People v. Floyd* (2003) 31 Cal.4th 179, 184 (*Floyd*).) In *Estrada*, *supra*, 63 Cal.2d 740, the California Supreme Court created a limited exception to that presumption. In that case, the court held that where a statute has been amended to lessen the punishment for an offense and there is no clear indication of an intent to apply the amendment prospectively only, it must be presumed that the Legislature intended the mitigated punishment to apply to all judgments not yet final as of the effective date of the amended statute. (*Id.* at pp. 744-747.) The court held, "'A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law.'" (*Id.* at p. 745.) From this, "[i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply," including those which are not yet final. (*Ibid.*)

The Legislature has never abrogated the *Estrada* rule. (See *People v. Nasalga* (1996) 12 Cal.4th 784, 792, fn. 7 (*Nasalga*).) The rule and its continued vitality were most recently discussed by the California Supreme Court in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*). In *Brown*, the court reiterated that *Estrada* "is today properly

17

understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by *articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments.*" (*Id*. at p. 324, italics added.)

Despite the *Estrada* presumption, however, a court interpreting a statute which ameliorates punishment must nevertheless determine the intent of the Legislature or of the electorate in enacting the statute. (*Floyd*, *supra*, 31 Cal.4th at p. 184.) To determine intent, courts look first to the language of the provision, giving its words their ordinary meaning. If that language is clear in relation to the problem at hand, there is no need to go further. (*Ibid*.) If the language is not clear, the tools of statutory construction must be applied, including but not limited to the *Estrada* rule. If necessary, the court must also look to other extrinsic indicators of intention. (*Nasalga*, *supra*, 12 Cal.4th at p. 794.)

There is no question that section 667(e)(2)(C) is an amendment which ameliorates punishment under the three strikes law for those defendants who meet its criteria. However, the Reform Act does not contain any explicit provision for retroactive or prospective application, and it does not explicitly state what remedy—i.e., section 667(e)(2)(C) or section 1170.126—applies to a person in defendant's position. Consequently, we must "look for any other indications" to determine and give effect to the intent of the electorate. (*Nasalga*, *supra*, 12 Cal.4th at p. 794.)

18

In enacting new laws, both the Legislature and the electorate are "presumed to be aware of existing laws and judicial construction thereof." (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11.) Accordingly, we presume that in enacting the Reform Act, the electorate was aware of the *Estrada* presumption that a law ameliorating punishment applies to all judgments not yet final on appeal on the effective date of the new statute. We also presume that the electorate was aware that a saving clause may be employed to make it explicit that the amendment is to apply prospectively only, and that in the absence of a saving clause or another clear signal of intent to apply the amendment prospectively, the statute is presumed to apply to all nonfinal judgments. (*Nasalga*, *supra*, 12 Cal.4th at p. 793; *Estrada*, *supra*, 63 Cal.2d at p. 747.) Previous ballot initiatives have employed explicit language making an ameliorative statute prospective. For example, the California Supreme Court held that the previous Proposition 36, approved by voters on November 7, 2000, applied prospectively only, despite its ameliorative effect, because it expressly stated, "'Except as otherwise provided, the provisions of this act shall become effective July 1, 2001, and its provisions shall be applied prospectively.'" (*Floyd*, *supra*, 31 Cal.4th at pp. 183-185.) The court in *Floyd* held that the plain language of this saving clause trumped any other possible interpretation of the proposition. (*Id*. at pp. 185-187.) In the Reform Act, in contrast, the absence of such language is persuasive evidence that the electorate did intend to apply section 667(e)(2)(C) to nonfinal judgments.

19

This construction, moreover, is fully consistent with the expressed purposes of the Reform Act. In *Floyd*, the court found further support in the ballot arguments in support of the proposition, which stated that "[i]f Proposition 36 passes, non-violent drug offenders *convicted for the first or second time after 7/1/2000*, will get mandatory, court-supervised treatment instead of jail." (Voter Information Guide, Gen. Elec. (Nov. 7, 2000) argument in favor of Prop. 36, p. 26, italics added; see *Floyd*, *supra*, 31 Cal.4th at pp. 187-188.) The ballot arguments in support of the Reform Act stated that its purpose was to ensure that "[p]recious financial and law enforcement resources" were not diverted to impose life sentences for some non-violent offenses, while assuring that violent repeat offenders are effectively punished and not released early. The proponents stated that the act would "help stop clogging overcrowded prisons with non-violent offenders, so we have room to keep violent felons off the streets" and "help[] ensure that prisons can keep dangerous criminals behind bars for life." An additional purpose was to save taxpayers "$100 million every year" by ending wasteful spending on housing and health care costs for "non-violent Three Strikes inmates." Moreover, the act would ensure adequate punishment of non-violent repeat offenders by doubling their state prison sentences. The proponents pointed out that dangerous criminals were being released early because "jails are overcrowded with non-violent offenders who pose no risk to the public." And, the proponents stated that by passing Proposition 36, "California will retain the toughest recidivist Three Strikes law in the country but will be fairer by emphasizing proportionality in sentencing and will provide for more evenhanded application of this important law." The proponents pointed out that "[p]eople convicted

20

of shoplifting a pair of socks, stealing bread or baby formula [*sic*] don't deserve life sentences." (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) argument in favor of Prop. 36 and rebuttal to argument against Prop. 36 <http://voterguide.sos.ca.gov/ propositions/36/arguments-rebuttals.htm> [as of Feb. 26, 2014].)

Applying section 667(e)(2)(C) to nonfinal judgments is wholly consistent with these objectives, in that doing so would enhance the monetary savings projected by the proponents and would further serve the purposes of reducing the number of non-violent offenders in prison populations and of reserving the harshest punishment for recidivists with current convictions for serious or violent felonies, while still assuring public safety by imposing doubled prison terms on less serious repeat offenders.

For both of these reasons—the absence of any expressed intent to apply the act prospectively only and the stated intent underlying the proposition—we conclude that section 667(e)(2)(C) applies to judgments which were not final as of its effective date.

In *People v. Yearwood* (2013) 213 Cal.App.4th 166 (review den. May 1, 2013, S209060) (*Yearwood*), currently the only published opinion on this issue in which review has not been granted, the court held that the Reform Act applies prospectively only. In *Yearwood*, as in this case, the defendant would have been entitled to second-strike sentencing under the Reform Act if he had been sentenced initially after the effective date of the Reform Act. He had already been sentenced and his appeal was pending on the date the act became effective. The court held that even though the judgment was not yet final, Yearwood's only remedy was to petition for recall of his sentence and for resentencing pursuant to section 1170.126. (*Yearwood*, at pp. 167, 168, 169.)

21

The court held, as we have, that the Reform Act does not contain a saving clause or refer to retroactive or prospective application or refer explicitly to persons in Yearwood's position. Nevertheless, the court held, section 1170.126 unambiguously applies to prisoners whose judgments were not final on the Reform Act's effective date, because those prisoners were "presently serving" an indeterminate life term under the three strikes law. (See § 1170.126(a).) The court held that section 1170.126 therefore effectively operates as the functional equivalent of a saving clause and, if section 667(e)(2)(C) is read not in isolation but in the context of the entire statutory scheme, it is clear that the mandatory sentencing provision of section 667(e)(2)(C) is intended to operate prospectively only. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.)

*Yearwood* is correct that even in the absence of an express saving clause there may be other reasons to determine that the enacting body intended the statute to apply prospectively only. *Brown*, *supra*, 54 Cal.4th 314, provides an example. In that case, the court held that an amendment to section 4019 which increased the rate at which prisoners may earn credits for good behavior applied prospectively only, despite the absence of express language to that effect, because the purpose of section 4019 is to provide an incentive for good behavior during incarceration. Accordingly, rather than reflecting a determination that a reduced penalty for *past* criminal conduct satisfies the legitimate ends of criminal law, section 4019 addresses "*future conduct* in a custodial setting by providing increased incentives for good behavior." (*Brown*, at p. 325.) Awarding the credit retroactively, for time spent in custody before the effective date of the amendment, would not further that purpose. Consequently, the court held, there is no logical basis for

22

inferring that the Legislature intended the amended statute to apply retroactively, and the *Estrada* rule does not apply. (*Brown*, at p. 325 & fn. 15.) The same is not true of the Reform Act, however. As we discussed above, retroactive application of section 667(e)(2)(C) is consistent with the proponents' stated objectives of reducing prison overcrowding, reducing the resources expended on third-strike offenders whose current and prior offenses are non-violent and less serious, and enhancing public safety by ensuring that the truly dangerous repeat offenders serve indeterminate life terms less. (More about this below.) Accordingly, there is a logical basis for inferring that the electorate intended the amendment to apply to nonfinal judgments.

Moreover, we do not agree with *Yearwood* that section 1170.126 unambiguously applies to defendants who were serving nonfinal third-strike sentences on the effective date of the Reform Act. In light of the *Estrada* presumption and the absence of a saving clause in section 667(e)(2)(C), the provision that section 1170.126(a) applies "exclusively to persons presently serving" a third-strike sentence *is* ambiguous—does it refer only to prisoners serving sentences which are final, or does it include those whose judgments are not final? It is certainly not so clear as to qualify as the functional equivalent of a saving clause. In *Nasalga*, *supra*, 12 Cal.4th 784, the California Supreme Court held that the rule of *Estrada* is "not implicated where the Legislature *clearly signals* its intent" to make an amendment prospective, "by the inclusion of either an express saving clause or its equivalent." (*Nasalga*, at p. 793, italics added.) The court did not describe what constitutes an "equivalent" to an express saving clause. However, the court stated that in the absence of an express saving clause, the "'quest for legislative intent'" requires that

23

"'the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' [Citation.]" (*Ibid.*) In our opinion, the statutory language that *Yearwood* relies on does not meet that requirement because it is ambiguous. We note, too, that *Yearwood* does not cite a single case in which similarly ambiguous language was deemed to be the equivalent of a saving clause.

*Yearwood* finds support for its position in the ballot arguments in favor of the Reform Act. It points out that enhancing public safety was a key purpose of the act. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.) The court states that giving section 667(e)(2)(C) prospective-only application furthers that purpose by reducing the likelihood that prisoners who are currently dangerous will be released from prison under the Reform Act. In contrast with section 1170.126, section 667(e)(2)(C) does not provide the court with discretion to impose a third-strike sentence if it finds that the defendant poses an "unreasonable risk of danger to public safety." (§ 1170.126(f).) *Yearwood* points out that several years may elapse between sentencing and finality, and a defendant who might objectively qualify for second-strike sentencing under section 667(e)(2)(C) may have shown him- or herself to pose such a risk by misconduct during post-sentencing incarceration. (*Yearwood*, at pp. 175-176.)

This is arguably a valid concern. However, it is not reflected in the ballot arguments in support of the Reform Act. We cannot say that a concern not expressed in a ballot argument is a clear indication of voter intent, no matter how valid the concern may be. Moreover, a defendant may also be incarcerated for many months before being convicted and sentenced for a third-strike offense. Such a defendant may also display a

24

propensity for violence or other conduct while incarcerated which indicates that he or she poses a risk to public safety. Nevertheless, any qualifying defendant convicted and sentenced after the effective date of the Reform Act is entitled to sentencing under section 667(e)(2)(C), and the trial court has no discretion to impose a third-strike sentence even if the court has concerns about the defendant's future dangerousness for any reason, including the defendant's conduct while in custody. For this reason as well, we do not find *Yearwood*'s analysis persuasive.

*3. Conclusion*

We conclude that in passing the Three Strikes Reform Act of 2012, the electorate intended the mandatory sentencing provision of sections 667(e)(2)(C) and 1170.12(c)(2)(C) to apply to qualifying defendants whose judgments were not yet final on the effective date of the act. Accordingly, we need not address defendant's other contentions.

5.

THE TRIAL COURT LACKED AUTHORITY TO ORDER DEFENDANT TO

PARTICIPATE IN DRUG COUNSELING WHILE IN PRISON

Section 1203.096 provides: "(a) Upon conviction of any felony in which the defendant is sentenced to state prison and in which the court makes the findings set forth in subdivision (b), a court shall, in addition to any other terms of imprisonment, fine, and conditions, recommend in writing that the defendant participate in a counseling or education program having a substance abuse component while imprisoned.

25

"(b) The court shall make the recommendation specified in subdivision (a) if it finds that any of the following are true:

"(1)  That the defendant at the time of the commission of the offense was under the influence of any alcoholic beverages.

"(2)  That the defendant at the time of the commission of the offense was under the influence of any controlled substance.

"(3)  That the defendant has a demonstrated history of substance abuse.

"(4)  That the offense or offenses for which the defendant was convicted are drug related."

In this case, at sentencing, the court ordered defendant to participate in a program having a substance abuse component.  The abstract of judgment and sentencing minutes state, "Defendant to participate in a counseling or educational program having a substance abuse component through the Division of Adult Institutions (PC 1203.096)." Defendant contends that this order constitutes an unauthorized sentence, in that the statute authorizes the court only to recommend participation in a substance abuse program.  He asks us to strike that order.  The Attorney General contends that by virtue of the statutory citation on the abstract of judgment, the Department of Corrections and Rehabilitation will understand that the court intended only to recommend participation. At most, the Attorney General states, we should order the abstract modified to reflect that it is a recommendation only.

26

Defendant is correct that the court's order exceeded its authority.  However, because we are remanding the cause for resentencing, the question of the appropriate remedy is moot.  On resentencing, the trial court shall phrase its recommendation that defendant participate in a substance abuse program as a recommendation, rather than an order.

## DISPOSITION

The cause is remanded for resentencing pursuant to Penal Code section 667, subdivision (e)(2)(C).  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____

J.

We concur:


HOLLENHORST_____

Acting P. J.


CODRINGTON_____

J.

27